**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| NEW ENGLAND CARPENTERS | ) | |
| HEALTH AND WELFARE FUND, | ) | |
| | ) | No. 1:12-cv-01662 |
| Plaintiff, | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| v. | ) | |
| | ) | |
| ABBOTT LABORATORIES, | ) | |
| | ) | |
| Defendant. | ) | |

## ABBOTT LABORATORIES' MOTION TO DISMISS

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

SUMMARY OF PLAINTIFF'S ALLEGATIONS ....................................................4

ARGUMENT ...............................................................................................................9

I.     STANDARD OF REVIEW ..............................................................................9

II.    THE COMPLAINT FAILS TO STATE A CIVIL RICO CLAIM.......................10

     A.     Plaintiff Has Not Adequately Pled a Plausible Fraud Claim ....................11

          1.     Abbott Does Not Owe Any Duty to Require Patients or Pharmacies to Disclose Use of Abbott's Savings Cards ..............12

          2.     Plaintiff's Non-Disclosure Theory Does Not Satisfy Rule 9(b) ....15

          3.     Plaintiff's Second Theory of Fraud is Equally Flawed.................17

          4.     The Complaint Fails to Adequately Plead Intent...........................19

     B.     Carpenters Fails to Allege a RICO Enterprise ...........................................20

     C.     Carpenters Lacks Standing to Pursue Any Alleged RICO Violation ........22

     D.     Plaintiff Fails to Adequately Allege Injury to its "Business or Property" Under 18 U.S.C. § 1964(c) .......................................................30

     E.     Plaintiff Has Not Pled a Conspiracy Under § 1962(d) .............................32

III.    PLAINTIFF'S ROBINSON-PATMAN ACT CLAIMS FAIL AS A MATTER OF LAW .......................................................................................32

     A.     Plaintiff Does Not Have An Antitrust Injury or Antitrust Standing ..........32

          1.     Plaintiff Does Not Have an Antitrust Injury Under Section 2(c)...33

          2.     Plaintiff Does Not Have Antitrust Standing Under Section 2(c)...36

     B.     Plaintiff Has Failed to State a Claim Under Section 2(c) ..........................37

          1.     Plaintiff's Members Are Not Its Agents or Other Type of Fiduciary ......................................................................................37

          2.     The Savings Cards Are Not "Secret"...........................................40

CONCLUSION...........................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Allen Pen Co. v. Springfield Photo Mount Co.,
   653 F.2d 17 (1st Cir. 1981) ...................................................................................33

Anza v. Ideal Steel Supply Corp.,
   547 U.S. 452 (2006) .......................................................................................28, 29

Armour & Co. v. United States,
   402 F.2d 712 (7th Cir. 1998) .................................................................................19

Aronoff v. DiBruno,
   No. 1:04-cv-1126, 2005 U.S. Dist. LEXIS 16942 (S.D. Ind. July 1, 2005) ...........20

Ashcroft v. Iqbal,
   556 U.S. 662 (2009) ...............................................................................................9

Augusta News Co. v. Hudson News Co.,
   269 F.3d 41 (1st Cir. 2001) ...................................................................................40

Bachman v. Bear, Stearns & Co.,
   178 F.3d 930 (7th Cir. 1999) .................................................................................22

BCS Servs., Inc. v. Heartwood 88, LLC,
   637 F.3d 750 (7th Cir. 2011) .....................................................................28, 29, 30

Bell Atl. Corp. v. Twombly,
   550 U.S. 544 (2007) ..........................................................................................9, 10

Blue Tree Hotels Inv. Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.,
   369 F.3d 212 (2d Cir. 2004) ..................................................................................15

Bridge v. Phx. Bond & Indem. Co.,
   553 U.S. 639 (2008) .......................................................................................23, 29

Bridges v. MacLean-Stevens Studios, Inc.,
   201 F.3d 6 (1st Cir. 2000) ................................................................................38, 40

Brittingham v. Mobil Corp.,
   943 F.2d 297 (3d Cir. 1991) ..................................................................................22

Bunker Ramo Corp. v. Cywan,
   511 F. Supp. 531 (N.D. Ill. 1981) .........................................................................35

Caraluzzi v. Prudential Sec., Inc.,
   824 F. Supp. 1206 (N.D. Ill. 1993) .......................................................................14

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

Cedric Kushner Promotions, Ltd. v. King,
    533 U.S. 158 (2001) ........................................................................................21

Clarendon Nat'l Ins. Co. v. Medina,
    645 F.3d 928 (7th Cir. 2010) ........................................................................38

Crichton v. Golden Rule Ins. Co.,
    576 F.3d 392 (7th Cir. 2008) ........................................................................21

Discon, Inc. v. NYNEX Corp.,
    93 F.3d 1055 (2d Cir. 1996) ..........................................................................21

Emery v. Am. Gen. Fin., Inc.,
    134 F.3d 1321, 1998 U.S. App. LEXIS 1112 (7th Cir. 1999) ...........................3, 21

Evans v. City of Chicago,
    434 F.3d 916 (7th Cir. 2006) .....................................................................23, 24

Fitch v. Ky.-Tenn. Light & Power Co.,
    136 F.2d 12 (6th Cir. 1943) ..........................................................................40

Fitzgerald v. Chrysler Corp.,
    116 F.3d 225 (7th Cir. 1997) ........................................................................22

Fuchs Sugars & Syrups, Inc. v. Amstar Corp.,
    447 F. Supp. 867 (S.D.N.Y. 1978) ................................................................39

Gamboa v. Velez,
    457 F.3d 703 (7th Cir. 2006) ........................................................................10

Goold Elecs. Corp. v. Galaxy Elecs., Inc.,
    No. 91 C 5989, 1991 U.S. Dist. LEXIS 18421 (N.D. Ill. Dec. 31, 1991) ...............35

Goren v. New Vision Int'l., Inc.,
    156 F.3d 721 (7th Cir. 1998) .....................................................................15, 32

Grace v. E.J. Kozin,
    538 F.2d 170 (7th Cir. 1976) ................................................................. passim

Graue Mill Dev. Corp. v. Colonial Bank & Trust Co.,
    927 F.2d 988 (7th Cir. 1991) ........................................................................15

Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.,
    998 F.2d 391 (7th Cir. 1993) ........................................................................33

## TABLE OF AUTHORITIES
### (continued)

Page(s)

Haroco, Inc. v. Am. Nat'l Bank & Trust Co. of Chi.,
   747 F.2d 384 (7th Cir. 1984) ................................................................21

Health Care Serv. Corp. v. Olivares,
   No. 2:10-CV-221-TJW-CE, 2011 U.S. Dist. LEXIS 117750 (E.D. Tex. Sept. 2,
   2011) ................................................................................................26, 31

Health Care Serv. Corp. v. Pfizer,
   No. 10-0221, 2012 U.S. Dist. LEXIS 89759 (E.D. Tex. Apr. 23, 2012)................................27

Hemi Grp., LLC v. City of New York,
   130 S.Ct. 983 (2010)................................................................23, 24, 29

Holmes v. Sec. Investor Protection Corp.,
   503 U.S. 258 (1992)................................................................28, 29

In re Actimmune Mktg. Litig.,
   614 F. Supp. 2d 1037 (N.D. Cal. 2009) ................................................................23

In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.,
   No. 05-CV-01699, 2012 U.S. Dist. LEXIS 111446 (N.D. Cal. Aug. 2, 2012) ................23, 26

In re Brand Name Prescription Drugs Antitrust Litig.,
   186 F.3d 781 (7th Cir. 1999) ................................................................5

In re Brand Name Prescription Drugs Antitrust Litig.,
   No. 94 C 897, MDL 997, 1999 U.S. Dist. LEXIS 550 (N.D. Ill. Jan. 19, 1999)..................5, 6

In re Pharm. Indus. Average Wholesale Price Litig.,
   230 F.R.D. 61 (D. Mass. Aug. 16, 2005)................................................................17

In re Schering Plough Corp. Intron/Temodar Consumer Class Action ("In re Schering"),
   678 F.3d 235 (3d Cir. 2012)................................................................23, 24

In re Schering Plough Corp. Intron/Temodar Consumer Class Action,
   No. 2:06-cv-5774, 2009 U.S. Dist. LEXIS 58900 (D.N.J. July 10, 2009) ................27, 28, 31

In re Schering Plough Corp. Intron/Temodar Consumer Class Action,
   No. 2:06-cv-5774, 2010 U.S. Dist. LEXIS 56621 (D.N.J. June 9, 2010)........................24, 31

In re Vioxx Prods. Liab. Litig.,
   Civ. No. 05-3700, 2010 U.S. Dist. LEXIS 142767 (E.D. La. Mar. 31, 2010)........................28

In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig. ("In re
   Yasmin"),
   No. 3:09-md-02100, 2010 U.S. Dist. LEXIS 80758 (S.D. Ill. Aug. 5, 2010) .......25, 26, 27, 28

## TABLE OF AUTHORITIES
### (continued)

Page(s)

In re Zyprexa Prods. Liab. Litig.,
    671 F. Supp. 2d 397 (E.D.N.Y. 2009) ..................................................................28

Int'l Bhd. Of Teamsters, Local 734 Health & Welfare Trust Fund v. Philip Morris Inc.,
    196 F.3d 818 (7th Cir. 1999) ............................................................................25

Ironworkers Local Union 68 v. AstraZeneca Pharms., LP,
    634 F.3d 1352 (11th Cir. 2011) ............................................25, 26, 30, 32

Ironworkers Local Union No. 68 v. AstraZeneca Pharms. LP,
    585 F. Supp. 2d 1339 (M.D. Fla. 2008)................................................................27

Kaye v. D'Amato,
    357 F. App'x 706 (7th Cir. 2009) .........................................................................10

Kochert v. Greater Lafayette Health Servs., Inc.,
    463 F.3d 710 (7th Cir. 2006) .......................................................................33, 36

Kolar v. Preferred Real Estate Invs., Inc.,
    361 F. App'x 354 (3d Cir. 2010) ..........................................................................12

Limestone Dev. Corp. v. Vill. of Lemont,
    520 F.3d 797 (7th Cir. 2008) ...............................................................................10

Local Beauty Supply, Inc. v. Lamaur, Inc.,
    787 F.2d 1197 (7th Cir. 1986) .............................................................................35

Lupia v. Stella D'Oro Biscuit Co.,
    586 F.2d 1163 (7th Cir. 1978) .......................................................................33, 40

Martin v. State Farm Mut. Auto. Ins. Co.,
    348 Ill. App. 3d 846, 808 N.E. 2d 47 (Ill. App. Ct. 2004)....................................39

Mason v. Medline Indus. Inc.,
    No. 07 C 5615, 2009 U.S. Dist. LEXIS 43500 (N.D. Ill. May 22, 2009) ..............16

McDonald v. Schencker,
    18 F.3d 491 (7th Cir. 1994) ................................................................................11

Meier v. Musburger,
    588 F. Supp. 2d 883 (N.D. Ill. 2008) ..............................................................10, 32

Midwest Grinding Co., Inc. v. Spitz,
    976 F.2d 1016 (7th Cir. 1992) .............................................................................11

**TABLE OF AUTHORITIES**
(continued)

Page(s)

Miyano Mach. U.S.A., Inc. v. Zonar,
    No. 92 C 2385, 1993 U.S. Dist. LEXIS 963 (N.D. Ill. Jan. 29, 1993) ....................................35

MLSMK Invs. Co. v. JP Morgan Chase & Co.,
    737 F. Supp. 2d 137 (S.D.N.Y. 2010)....................................................................................19

Moore v. J.B. Hunt Transp., Inc.,
    221 F.3d 944 (7th Cir. 2000) ..................................................................................................7

New Eng. Carpenters Health Benefits Fund v. McKesson Corp.,
    573 F. Supp. 2d 431 (D. Mass. 2008) .....................................................................................9

Pa. Emps. Benefit Trust Fund v. AstraZeneca Pharm. LP,
    No. 6:09-cv-5003-Orl-22DAB, 2009 U.S. Dist. LEXIS 76555 (M.D. Fla. July 18,
    2009) ...............................................................................................................................27, 28

Quantum Grinding Corp., Inc. v. Supreme Screw Prods., Inc.,
    No. 03 C 0722, 2003 U.S. Dist LEXIS 18787 (N.D. Ill. Oct. 20, 2003) ................................35

Ransom v. A.B. Dick Co.,
    289 Ill. 663, 682 N.E.2d 314 (Ill. App. Ct. 1997)...................................................................38

Reynolds v. E. Dyer Dev. Co.,
    882 F.2d 1249 (7th Cir. 1989) ...........................................................................13, 15, 21, 23

Richmond v. Nationwide Cassel L.P.,
    52 F.3d 640 (7th Cir. 1995) ..................................................................................................21

R.J. Mgmt. Co. v. SRLP Dev. Corp.,
    346 Ill. App. 957, 806 N.E.2d 1074 (Ill. App. Ct. 2004).........................................................38

Robin v. Arthur Young & Co.,
    915 F.2d 1120 (7th Cir. 1990) ..............................................................................................15

Rubloff Dev. Grp., Inc. v. SuperValu, Inc.,
    No. 10 C 3917, 2012 U.S. Dist. LEXIS 41304 (N.D. Ill. Mar. 27, 2012) ...............................28

Salinas v. United States,
    522 U.S. 52 (1997)...............................................................................................................32

Sanner v. Bd. of Trade of Chi.,
    62 F.3d 918 (7th Cir. 1995) ..................................................................................................36

Se. Laborers Health & Welfare Fund v. Bayer Corp.,
    444 F. App'x 401 (11th Cir. 2011) .........................................................................................26

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

Se. Laborers Health & Welfare Fund v. Bayer Corp.,
  655 F. Supp. 2d 1270 (S.D. Fla. 2009) ...................................................................28

Serfecz v. Jewel Food Stores,
  67 F.3d 591 (7th Cir. 1995) ...................................................................................36

Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP,
  No. 08-CV-0179, 2011 U.S. Dist. LEXIS 26857 (E.D.N.Y. Feb. 16, 2011)..........28

Shields v. Citytrust Bancorp, Inc.,
  25 F.3d 1124 (2nd Cir. 2004)..................................................................................16

Slaney v. Int'l Amateur Athletic Fed'n,
  244 F.3d 580 (7th Cir. 2001) ...........................................................................10, 11

Stachon v. United Consumers Club, Inc.,
  229 F.3d 673 (7th Cir. 2000) ..................................................................................11

Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.,
  171 F.3d 912 (3d Cir. 1999).............................................................................24, 28

Sw. Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n,
  830 F.2d 1374 (7th Cir. 1987) ................................................................................37

Teamsters Local 282 Pension Trust Fund v. Angelos,
  762 F.2d 522 (7th Cir. 1985) ..................................................................................15

Tri-Gen Inc. v. Int'l Union of Operating Eng'rs,
  433 F.3d 1024 (7th Cir. 2006) ................................................................................33

UFCW Local 1776 v. Eli Lilly & Co.,
  620 F.3d 121 (2d Cir. 2010)............................................................................ passim

United Food & Commercial Workers Cent. Pa. & Reg'l Health & Welfare Fund v.
  Amgen, Inc.,
  400 F. App'x 255 (9th Cir. 2010) .....................................................................25, 26

United Food & Commercial Workers Unions & Emp'rs Midwest Health Benefits Fund v.
  Walgreen Co.,
  No. 12 C 204, 2012 U.S. Dist. LEXIS 104315 (N.D. Ill. July 26, 2012) ..................9

United States v. Dial,
  757 F.2d 163 (7th Cir. 1985) ..................................................................................13

United States v. Keplinger,
  776 F.2d 678 (7th Cir. 1985) ..................................................................................13

**TABLE OF AUTHORITIES**
(continued)

Page(s)

United States v. Leahy,
464 F.3d 773 (7th Cir. 2006) ................................................................12

Wankel v. S. Ill. Bancorp, Inc.,
Civ. No. 06-619, 2007 U.S. Dist. LEXIS 61138 (S.D. Ill. Aug. 21, 2007) ............................19

Williams v. Aztar Ind. Gaming Corp.,
351 F.3d 294 (7th Cir. 2003) ................................................................12

STATUTES AND REGULATIONS

18 U.S.C. § 1341 ................................................................................11

18 U.S.C. § 1961 ................................................................................11, 21

18 U.S.C. § 1962 ................................................................................ passim

18 U.S.C. § 1964 ................................................................................22, 30

42 C.F.R. 447 ................................................................................18

BUDGET OF MASSACHUSETTS, FISCAL YEAR 2013, §§ 128-131, 201, 226 (2012) ........................17

FED. R. CIV. P. 9(b) ................................................................................11, 15, 16, 19

FED. R. CIV. P. 12(b)(6) ................................................................................9

Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No.
108-173, 117 Stat. 2066 (2003) ................................................................17

Robinson-Patman Act § 2(c), 15 U.S.C. § 13(c) ................................................................ passim

OTHER AUTHORITIES

Letter from FTC Bureau of Competition to Maritz, Inc. (June 21, 1994), reported in 47
Antitrust & Trade Reg. Rep. (BNA) 16 (July 5, 1984)........................................................40

RESTATEMENT (THIRD) OF AGENCY § 1.01 ................................................................38

Defendant Abbott Laboratories ("Abbott") submits this memorandum of law in support of its Motion to Dismiss plaintiff New England Carpenters Health and Welfare Fund's ("Carpenters") Complaint.

## PRELIMINARY STATEMENT

Plaintiff alleges, on behalf of a putative class of third-party health care insurers and payors ("TPPs"), that Abbott's decision to provide savings cards to patients prescribed two Abbott prescription drugs somehow constitutes a racketeering enterprise and a violation of the antitrust laws.

Plaintiff objects to these programs because, as alleged in the Complaint, Abbott absorbs the cost of a portion of the co-payments TPPs impose on patients. According to plaintiff, the size of the co-payment is designed either to encourage or discourage a patient to utilize the drug prescribed by the patient's physician. In exchange for encouraging the use of one prescription drug over others, TPPs demand and receive rebates from the favored manufacturer. Abbott's decision to support a patient's ability to use the treatment prescribed by their physicians therefore interferes with TPPs' desire to influence utilization of the drugs they favor. Plaintiff may dislike patient savings programs offered by Abbott and other manufacturers for the reasons it states, but the Abbott programs violate no law, and plaintiff has failed to plead a violation of RICO or the Robinson-Patman Act ("RP Act").

Plaintiff does not allege that providing savings cards to patients or that the use of those cards are "predicate acts" of racketeering. The crux of plaintiff's RICO allegation is that Abbott commits mail and wire fraud when a pharmacist, patient, or Abbott fails to disclose to plaintiff that a patient is using an Abbott savings card to satisfy, in whole or in part, the patient's co-pay. This fails to state a RICO claim for several reasons.

1

First, the Complaint fails to adequately plead a plausible mail or wire fraud. The Complaint identifies no duty—statutory, fiduciary, or otherwise—that would require Abbott, directly or indirectly through a patient or a pharmacist, to notify plaintiff that a given patient is using a savings card or that a pharmacist had accepted such a card. Plaintiff concedes that it was well aware of these "highly publicized" programs and there is no allegation that Abbott advises patients or pharmacists not to disclose their use of a savings card or that Abbott provides any financial incentive not to disclose their use.

Alternatively, plaintiff contends that Abbott's failure to reduce published wholesale prices for the two Abbott drugs in question by the amount of the savings cards utilized by patients somehow constitutes fraud. This theory is implausible on its face because the savings card used by a patient to cover part of the patient's out-of-pocket cost has no bearing on the purchase price paid by a wholesaler or pharmacy to acquire the drug.

The Complaint also lacks the necessary particularized facts to support plaintiff's fraud claim. For example, the Complaint contains no allegation that the use or acceptance of Abbott's savings cards violate patients' or pharmacists' contracts with plaintiff. Nor does the Complaint allege what steps, if any, plaintiff—which knew about the programs—would have taken if it was advised that a particular patient was using a savings card. Moreover, plaintiff concedes that the intent behind these coupon or savings card programs is competition rather than fraud.

Second, the Complaint fails to allege a RICO enterprise. Plaintiff fails to plead how Abbott and the third-party administrators Abbott uses are sufficiently distinct to create a RICO enterprise. The alleged enterprise here bears no resemblance to what the Seventh Circuit has described as the "paradigmatic RICO case in which a criminal obtains control of a separate legitimate (or legitimate-appearing) firm and uses the firm as the instrument of his criminality."

2

Emery v. Am. Gen. Fin., Inc., 134 F.3d 1321, 1324, 1998 U.S. App. LEXIS 1112 (7th Cir.
1999).

Third, Plaintiff does not have standing under RICO because the Complaint does not
allege facts from which it may plausibly be inferred that Abbott's alleged fraudulent conduct was
the "but for" and proximate causes of any alleged injury. Plaintiff must show a sufficient link
between the alleged RICO predicate acts, rather than the use of savings cards, and the harm
alleged in order to have standing. However, the Complaint fails to plead facts showing how the
non-disclosure that a given patient is using a savings card or the failure to deduct the card's value
from published wholesale prices are the cause of the harm plaintiff alleges—plaintiff's
reimbursement for Abbott's drugs rather than allegedly less expensive therapeutic alternatives.
Plaintiff does not allege that, but for the non-disclosure, it would not have paid the pharmacist
for the Abbott drugs sold to plaintiff's members. And plaintiff could not allege that the cards
have any impact on the pharmacist's purchase price or re-sale price. Further, the Complaint
ignores proximate cause and fails to address that physicians, often specialists, prescribe these
drugs based on their independent medical judgment of a patient's unique needs and the safety and
efficacy profiles of these drugs. Courts have repeatedly dismissed RICO claims based on a lack
of proximate cause where, as here, plaintiff's claim rests on determining the reason physicians
prescribe the drug in question—whether it is because of some allegedly improper conduct on the
part of the manufacturer (e.g., off-label promotion) or because the physician, exercising his or
her medical judgment, concluded that the drug prescribed was the most appropriate drug for the
patient.

The Complaint does not allege why physicians would have prescribed therapeutic
alternatives rather than the Abbott drugs if plaintiff had been advised that a given patient was

using a savings card, or if the value of the card had been deducted from the published wholesale price.

Fourth, plaintiff has not pled sufficient facts to support the allegations of any injury to its "business or property."[1]

Plaintiff's antitrust claim fares no better. Plaintiff fails to allege antitrust injury or standing under Section 2(b) of the RP Act. The Complaint also fails to plausibly show that Abbott savings cards constitute "commercial bribery" in violation of the RP Act. The linchpin of this claim is that the patient is an "agent" or "intermediary" of the TPP. Plaintiff fails to plead sufficient facts showing how the beneficiary of an insurance policy—for which the beneficiary or his employer paid a premium to a TPP—can somehow be considered an agent or intermediary of that TPP to whom some fiduciary obligation is owed. In addition, plaintiff concedes that the savings cards are not the kind of "secret" bribes proscribed by Section 2(c).

## SUMMARY OF PLAINTIFF'S ALLEGATIONS

### The Parties

Plaintiff and the putative class it seeks to represent are third-party payors of health care costs incurred by eligible beneficiaries and participants in consideration for premium payments for such benefits. Compl. ¶ 8. Abbott is an Illinois-based health care company engaged in, among other things, the research, development, and sale of innovative brand name prescription drugs. Id. at ¶ 9.

### Prescription Drug Distribution in the United States

Like other brand name pharmaceutical manufacturers, Abbott sells its prescription drugs to large national drug wholesalers and large retail chains with wholesaling capacity. Wholesalers

---

[1] Plaintiff's RICO conspiracy claims are wholly dependent on its substantive RICO claims and therefore suffer from the same fatal infirmities.

4

in turn sell those drugs to retail pharmacies that in turn fill prescriptions for patients.  See In re Brand Name Prescription Drugs Antitrust Litig., 186 F.3d 781, 784 (7th Cir. 1999).

Brand name pharmaceutical manufacturers do not generally give discounts or rebates to drug wholesalers or retail pharmacies because neither can influence utilization of a given brand name drug versus a competing drug.  The decision as to what drug to prescribe is made by the patient's doctor. [2]  Compl. ¶ 27.  Wholesalers and pharmacies do not create demand for particular prescription drugs; they respond to the demand created by physician prescribing decisions.  See In re Brand Name Prescription Drugs Antitrust Litig., No. 94 C 897, MDL 997, 1999 U.S. Dist. LEXIS 550, at *2-3 (N.D. Ill. Jan. 19, 1999).

**Prescription Drug Coverage**

Among the healthcare benefits provided by plaintiff is reimbursement for the cost of drugs prescribed by the patient's physician.  Compl. ¶¶ 8, 14-16, 27-28.  For patients covered by private or public health insurance plans, where the patient presents the prescription to be filled, pharmacies will dispense what the doctor prescribed, collect whatever co-pay (if any) is required under the patient's plan, and then seek reimbursement from the patient's health plan pursuant to whatever reimbursement terms the pharmacy and TPP have agreed upon.  Id. at ¶ 22, 27.

The extent of a patient's co-payment will vary depending on the nature of the contract with the TPP and the particular drug prescribed by a physician.  Id. at ¶ 28.  As alleged in the Complaint, many TPPs place drugs on different tiers with each tier having a different co-pay level.  For example, generic drugs may be placed on Tier 1, with the TPP imposing a lower co-pay than drugs placed on other tiers.  Id. at ¶¶ 43-46.  On Tier 2, an insurer may place a brand name drug that the TPP, rather than a physician or patient, prefers.  Id.  While the co-payment

---

[2] When there is a generic "AB-rated" version of the brand name drug, state laws permit the pharmacist to dispense the generic rather than the brand unless the physician has instructed otherwise.  Compl. ¶ 50.  As noted below, there are no generic versions of AndroGel or Humira that a pharmacist could dispense.

obligation on the patient may be higher than the Tier 1 co-payment for a generic, the Tier 2 co-payment will be lower than the co-payment for a non-preferred brand name drug that the TPP places in a higher tier. Id. TPPs auction placement on Tier 2, collect rebates from manufacturers seeking preferred status for their drugs, and assign other competing therapeutic alternatives to higher tiers.

Plaintiff alleges that the use of co-payments imposed on beneficiaries is designed to share the cost of prescription drug benefits and control prescription drug costs. Id. at ¶ 2, 27-29. However, the Complaint contains no factual allegations that different co-pay levels have actually influenced physician-prescribing decisions for the two Abbott drugs at issue. For example, plaintiff fails to plead any facts showing that physicians were more likely to prescribe a drug in Tier 2 for a given patient's insurance plan as opposed to a drug in Tier 3. Nor does plaintiff identify which tiers it puts AndroGel or Humira on, or allege that either AndroGel or Humira is always placed in Tier 2 or Tier 3 by TPPs. Indeed, brand name drug manufacturers have long given rebates to TPPs in an effort to secure placement on that TPP's formulary and to be placed in a given tier. See UFCW Local 1776 v. Eli Lilly & Co., 620 F.3d 121, 126, 134 (2d Cir. 2010); In re Brand Name Prescription Drugs Antitrust Litig., 1999 U.S. Dist. LEXIS 550, at *2-3. One TPP may place a certain brand name drug on Tier 2 because the manufacturer agreed to give the TPP rebates, while another TPP may put that same drug in a non-preferred tier with a higher co-pay because that TPP has auctioned its Tier 2 slot to the manufacturer of an alternative therapy.

Given the chain of distribution discussed above, the rebates given to TPPs have no impact on the price a wholesaler or retail pharmacy will pay to acquire a prescription drug. Like the savings cards, the rebates obtained by TPPs do not affect wholesale prices.

**Humira and AndroGel**

Humira and AndroGel are two prescription drugs sold by Abbott.  Humira is a biological agent approved by the FDA for, among other things, the treatment of rheumatoid arthritis ("RA") and juvenile idiopathic arthritis.  These are serious and disabling auto-immune diseases.  For example, RA is a complex disease in which the body mistakenly attacks healthy joints, causing permanent joint damage.  See http://www.humira.com/ra/default.aspx; Moore v. J.B. Hunt Transp., Inc., 221 F.3d 944, 948 (7th Cir. 2000).  Humira is also indicated for treatment of other serious auto-immune diseases, such as moderate to severe Crohn's disease and moderate to severe chronic plague psoriasis in adults.  See http://www.humira.com/global/financial-assistance.aspx.  According to the Complaint, a dose of Humira can cost an average of $1,633.  Compl. ¶ 77.

Plaintiff does not allege that there is a generic version of Humira that a pharmacist can dispense when a physician prescribes Humira for a patient.  Instead, plaintiff alleges that a physician, rather than prescribing Humira, could prescribe less expensive "therapeutic alternatives."  According to plaintiff, these include simple analgesics like acetaminophen (the active ingredient in Tylenol) and ibuprofen (the active ingredient in Motrin).  Id. at ¶ 76.  The notion that physicians would seriously consider Tylenol or Motrin as an alternative to a highly complex biologic agent such as Humira for the treatment of serious auto-immune diseases such as RA or Crohn's Disease is simply not plausible.  Moreover, as documents cited in the Complaint make clear, Humira is often used in conjunction with other drugs, including ones that plaintiff identifies as "less expensive therapeutic alternatives."  For example, as one document notes, there is data showing more than half of patients with early rheumatoid arthritis treated with Humira, plus methotrexate, showed no further joint damage at five years.  See Event Brief

<u>of Q2 2009 Abbott Earnings Conference Call – Final</u>, FD (FAIR DISCLOSURE) WIRE (July 15, 2009) (cited in Compl. n.11).

The other Abbott drug at issue is AndroGel which comes in two dosage forms—AndroGel 1% and AndroGel 1.62%. Compl. ¶ 63. These are topical gel forms of prescription strength testosterone approved by the FDA for the treatment of men suffering from low testosterone levels and its adverse health consequences. As in the case of Humira, plaintiff does not allege that there is a generic version of AndroGel that a pharmacist can dispense when a physician prescribes AndroGel for a patient. Instead, plaintiff simply alleges that there are less expensive therapeutic alternatives that apparently a physician could consider prescribing instead of AndroGel, including an injectable testosterone rather than a topical gel like AndroGel. <u>Id.</u> at ¶ 64.

### <u>The Abbott Savings Card Programs</u>

The Complaint alleges that in 2008, Abbott instituted savings card programs for Humira and AndroGel. <u>Id.</u> at ¶¶ 65, 78. According to plaintiff, patients present an Abbott savings card at the pharmacy when filling their prescription. <u>Id.</u> at ¶¶ 22, 85. The pharmacist processes the prescription with the patient's insurance plan first, which informs the pharmacist how much the patient's co-pay is. <u>Id.</u> If the patient presents his or her savings card, and if the pharmacy chooses to accept it, the pharmacist processes the savings card. <u>Id.</u> at ¶¶ 22, 86. Instructions on the back of the card tell the pharmacist how to get payment from Abbott, and the patient pays the remainder at the register. <u>Id.</u> at ¶ 21-22, 86. In the case of AndroGel, the Complaint alleges that Abbott would pay $20 of a patient's co-pay for a monthly prescription for up to twelve prescriptions. <u>Id.</u> at ¶ 66. Plaintiff alleges that the Humira Protection Plan could reduce a patient's co-pay to $5.00 a month. <u>Id.</u> at ¶ 79.

8

There is no allegation that the Abbott programs were a secret. According to plaintiff, they have been advertised through full color advertisements in magazines with nationwide circulation. Id. at ¶¶ 82, 128. There is no allegation that Abbott directed any patient or pharmacist to hide the use of a savings card from any TPP. Moreover, there is no allegation that there is anything which has prevented plaintiff or other TPPs from (1) requiring pharmacies to provide such information when seeking reimbursement; or (2) declining to reimburse prescription drugs for which there are manufacturer coupons.

## ARGUMENT

## I. STANDARD OF REVIEW

To defeat a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A complaint that contains factual allegations that are "merely consistent with a defendant's liability . . . stops short of the line between possibility and plausibility of entitlement to relief." Id. (internal quotation marks and citation omitted); see also United Food & Commercial Workers Unions & Emp'rs Midwest Health Benefits Fund v. Walgreen Co., No. 12 C 204, 2012 U.S. Dist. LEXIS 104315, at *6 (N.D. Ill. July 26, 2012). Thus, the court "is free to disregard bald assertions, unsupportable conclusions, and opprobrious epithets." New Eng. Carpenters Health Benefits Fund v. McKesson Corp., 573 F. Supp. 2d 431, 434 (D. Mass. 2008) (internal quotation marks and citation omitted).

The standard articulated in Twombly is of particular importance in antitrust and RICO cases. The "'costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint.'"

Twombly, 550 U.S. at 558 (quoting Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1106 (7th Cir. 1984)). These concerns are particularly important in RICO actions, "which resemble[] an antitrust case in point of complexity and the availability of punitive damages and of attorneys' fees to the successful plaintiff. RICO cases, like antitrust cases, are 'big' cases and the defendant should not be put to the expense of big-case discovery on the basis of a thread-bare claim." Limestone Dev. Corp. v. Vill. of Lemont, 520 F.3d 797, 803 (7th Cir. 2008).

## II. THE COMPLAINT FAILS TO STATE A CIVIL RICO CLAIM

"Congress enacted RICO to target long-term criminal activity, not as a means of resolving routine commercial disputes." Kaye v. D'Amato, 357 F. App'x 706, 717 (7th Cir. 2009) (citing Midwest Grinding Co., Inc. v. Spitz, 976 F.2d 1016, 1019 (7th Cir. 1992)).[3] RICO does not proscribe Abbott's open and above-board response to plaintiff's unilateral imposition of high co-pays on Abbott drugs prescribed by physicians for plaintiff's members.

Section 1962 makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). To state a valid RICO claim under § 1962(c), a plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Slaney v. Int'l Amateur Athletic Fed'n, 244 F.3d 580, 597 (7th Cir. 2001) (citation omitted). Each element of a RICO claim must be clearly satisfied because RICO "does not cover all instances of wrongdoing[;] [r]ather, it is a unique cause of action that is concerned with eradicating organized, long-term, habitual criminal activity." Gamboa v. Velez, 457 F.3d 703, 705 (7th Cir. 2006) (citations omitted).

---

[3] RICO's aim is to combat "certain specified, long-term, pervasive criminality" and not "to establish a code of business or professional ethics, the breach of which permits suit in federal court for treble damages and attorneys' fees." Meier v. Musburger, 588 F. Supp. 2d 883, 913 (N.D. Ill. 2008).

10

As explained below, plaintiff's Complaint fails to allege a RICO violation in a number of respects.

### A.    Plaintiff Has Not Adequately Pled a Plausible Fraud Claim

To allege a pattern of racketeering activity, a plaintiff must allege at least two predicate acts of racketeering.  18 U.S.C. § 1961(5); Midwest Grinding, 976 F.2d at 1019.  Mail and wire fraud are predicate acts specified by RICO.  18 U.S.C. § 1961(1); see also Stachon v. United Consumers Club, Inc., 229 F.3d 673, 675 n.1 (7th Cir. 2000).

The Seventh Circuit has held that "[t]o sufficiently plead an indictable act of mail fraud under 18 U.S.C. § 1341, [plaintiff must] allege that: (1) the defendant has participated in a scheme to defraud and (2) the defendant has mailed or has knowingly caused another to mail a letter or other matter for the purpose of executing the scheme"; but the words "scheme or artifice to defraud" are not satisfied by merely alleging unethical conduct.  McDonald v. Schencker, 18 F.3d 491, 494-95 (7th Cir. 1994) (citing United States v. Swinson, 993 F.2d 1299, 1300 (7th Cir. 1993)).

Where, as here, the plaintiff asserts mail or wire fraud as the predicate acts, the fraud must be pled with the particularity required by Rule 9(b).  Midwest Grinding, 976 F.2d at 1020.  Such a plaintiff must state "the time, place, and content of the alleged false representations, the method by which the misrepresentations were communicated, and the identities of the parties to those misrepresentations."  Slaney, 244 F.3d at 597; see also McDonald, 18 F.3d at 495 ("Rule 9(b) . . . requires RICO plaintiffs, like any other plaintiffs pleading fraud in the federal courts, to plead 'all averments of fraud with particularity.'  'Most importantly, complaints charging fraud must sufficiently allege the defendant's fraudulent intent.'") (citations omitted).[4]

---

[4] Federal courts have been particularly vigilant in scrutinizing RICO claims "because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not

11

The Complaint alleges two underlying theories of fraud. The first is that Abbott has concealed a material fact by failing to "instruct" pharmacists processing claims under its co-pay programs to disclose the use of a co-pay card to a patient's insurer. Compl. ¶¶ 22-23, 84-87, 135. The second theory is that Abbott makes false statements when it reports unspecified "benchmark" prices to unspecified reporting agencies, because these prices 'fail[] to account" for Abbott's co-pay programs. Id. at ¶¶ 57-58, 136. Neither of these constitute fraud, and neither is pled with the requisite particularity.

### 1. Abbott Does Not Owe Any Duty to Require Patients or Pharmacies to Disclose Use of Abbott's Savings Cards

The elements of mail or wire fraud are: "(1) a scheme to defraud; (2) an intent to defraud; and (3) use of the mails or wires in furtherance of the scheme." United States v. Leahy, 464 F.3d 773, 786 (7th Cir. 2006). A "scheme to defraud" requires "the making of a false statement or material misrepresentation, or the concealment of a material fact." Williams v. Aztar Ind. Gaming Corp., 351 F.3d 294, 299 (7th Cir. 2003) (citations omitted).

The Complaint does not identify any fraudulent statements pharmacists or patients have to make to plaintiff in the course of using Abbott's savings cards. Nor does it identify any "instructions" Abbott gives to pharmacists or patients, or the particulars of any statements or communications. Accordingly, plaintiff's scheme to defraud is not based on affirmative misrepresentations by pharmacists or patients. (And even if plaintiff did identify such a misrepresentation, plaintiff would need to plead facts showing that Abbott directed them to make such misrepresentations or knew of the misrepresentations and had a duty to correct them.)

---

support it." Kolar v. Preferred Real Estate Invs., Inc., 361 F. App'x 354, 363 (3d Cir. 2010) (unpublished) (internal quotation marks and citation omitted).

Instead, the Complaint conflates the lack of an instruction to disclose with an instruction not to disclose. The difference is an important one: compared to an active misrepresentation, "[l]iability is narrower for nondisclosure." United States v. Dial, 757 F.2d 163, 168 (7th Cir. 1985). A mere omission or failure to disclose, without more, is not enough. See Reynolds v. E. Dyer Dev. Co., 882 F.2d 1249, 1252 (7th Cir. 1989); see, e.g., Dial, 757 F.2d at 170 (recognizing a distinction between nondisclosure and active concealment); United States v. Keplinger, 776 F.2d 678, 697 (7th Cir. 1985) (affirming judgment against defendant but explaining "we do not imply that all or even most instances of non-disclosure of information that someone might find relevant come within the purview of the mail fraud statute").

Plaintiff alleges nothing more than a mere omission. While the Complaint presents extensive policy arguments about the benefits of cost-sharing between the insurers and insured, these policy arguments do not address the question of why a pharmacist or patient has a legal duty to disclose to a TPP how a given patient satisfies his or her co-pay—let alone why Abbott has some legal duty to instruct pharmacists or patients to provide such notice. The Complaint points to nothing in the reimbursement agreements between TPPs and pharmacists or patients creating such a disclosure obligation. Nor does the Complaint allege that the use or acceptance of a savings card violates patient's or pharmacist's contracts with plaintiff.

The Complaint does not even use the word "duty". It simply alleges that Abbott knows when a patient uses a savings card and must disclose this information to insurers. However, there is no allegation that Abbott knows the identity of the patient's insurer. All the Complaint alleges is that Abbott knows the identity of the patient and the pharmacy. But mere knowledge, possession, or control of information does not create a duty out of thin air.

In addition to the absence of facts upon which the Court could infer some duty on Abbott's part, plaintiff's theory of concealment does not withstand scrutiny. The Complaint actually highlights the promotion of Abbott's co-pay program through advertising in print, television, and internet media. Compl. ¶¶ 68, 70, 82, 128. Plaintiff acknowledges that insurance providers "are generally aware" of co-pay programs, id. at ¶ 124, and that these programs are "open and notorious," id. at ¶ 56. Thus, there is no suggestion that Abbott actively conceals the existence of its co-pay programs, or that the existence or nature of its co-pay programs is a secret.

Nor does the Complaint allege why the information it alleges has been withheld would have been material. There is no allegation that plaintiff would have paid less had the pharmacist or patient advised plaintiff that a savings card was used for a particular transaction. Plaintiff alleges no contractual provision by which it would have been permitted to reduce its reimbursement share if notified that a coupon or savings card was being used. Thus, the "failure" to provide co-pay assistance information at the transaction level cannot have been an omission of a material fact.

The Complaint further fails to address why plaintiff was contractually unable to obtain the information it contends it has been lacking by requiring pharmacists or patients to advise plaintiff when a savings card is used or by declining to provide coverage for drugs for which savings cards are available. See Caraluzzi v. Prudential Sec., Inc., 824 F. Supp. 1206, 1212 (N.D. Ill. 1993) ("Omissions do not amount to a scheme to defraud where the items allegedly omitted could have been discovered through the exercise of ordinary intelligence." (citations omitted)). According to the Complaint, Plaintiff "possesses information about the subsidized prescriptions, including the name and specific identifying information about each participating

member and the pharmacy where the prescription [is] filled." Compl. ¶ 142. Given its possession of this information, its awareness of the co-pay programs, and its direct relationship with both patients and pharmacists, Plaintiff cannot credibly argue that it could not have discovered the specific details of the co-pay programs and addressed the alleged "omission." See Reynolds, 882 F.2d at 1253 ; cf. Teamsters Local 282 Pension Trust Fund v. Angelos, 762 F.2d 522, 529-30 (7th Cir. 1985) (in SEC Rule 10b-5 securities fraud action, "[i]f the [plaintiff] knows enough so that the lie or omission still leaves him cognizant of the risk, then there is no liability").

Absent a legal duty to disclose, a failure to provide information cannot form the basis for a fraud claim. The use of an Abbott savings card, therefore, does not constitute an actionable fraud. The injury described in the Complaint—that copayment subsidies "influence prescription drug choices" and cause plaintiff to pay for "an increased number of [Humira and AndroGel] prescriptions," Compl. ¶¶ 20, 166—rests on conduct that is not fraudulent.

### 2. Plaintiff's Non-Disclosure Theory Does Not Satisfy Rule 9(b)

As discussed above, plaintiff's non-disclosure theory is based on broad conclusory allegations, which assumed pharmacists, patients and/or Abbott owe a duty to disclose when a patient uses a savings card. Conclusory allegations are insufficient. Goren v. New Vision Int'l., Inc., 156 F.3d 721, 729 (7th Cir. 1998) (plaintiff must provide more than conclusory allegations to satisfy Rule 9(b)); see also Robin v. Arthur Young & Co., 915 F.2d 1120, 1127 (7th Cir. 1990) ("rote conclusions" are not enough).

Characterizing Abbott's savings cards as "kickbacks" is not a substitute for factual allegations demonstrating a duty to disclose or a scheme to defraud. Graue Mill Dev. Corp. v. Colonial Bank & Trust Co., 927 F.2d 988, 992 (7th Cir. 1991) ("'Cryptic statements' suggesting fraud are not enough . . . ." (citation omitted)); cf. Blue Tree Hotels Inv. Ltd. v. Starwood Hotels

& Resorts Worldwide, Inc., 369 F.3d 212, 221 (2d Cir. 2004) ("Substituting [their] repeated use

in their complaint of the freighted word 'Kickback' with the more benign 'vendor payment'

reveals that the Blue Tree Owners have not alleged any improper intent or conduct on the part of

the vendors who made the payments to Starwood.") (discussing RP Act claim); Mason v.

Medline Indus. Inc., No. 07 C 5615, 2009 U.S. Dist. LEXIS 43500, at *12 (N.D. Ill. May 22,

2009) (dismissing False Claims Act action where plaintiff "offer[ed] no facts at all supporting his

characterization of the donations as kickbacks or bribes").  These sorts of allegations that

"couple a factual statement with a conclusory allegation of fraudulent intent" do not satisfy Rule

9(b).  Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1129 (2nd Cir. 2004).

The types of "particulars" required by Rule 9(b) that are noticeably absent from the

Complaint include the failure to identify:

- any contractual obligation or duty requiring the pharmacy to advise plaintiff when an Abbott savings card is being used;

- any contractual obligation or duty requiring the patient to advise plaintiff when he or she is using an Abbott savings card;

- any efforts by Abbott to encourage pharmacies not to disclose when a patient uses an Abbott savings card;

- any provisions in plaintiff's contracts with patients or pharmacists prohibiting Abbott (or any manufacturer)  from assisting a patient in paying the co-pay; and

- any provision in plaintiff's contracts with patients prohibiting patients' use of co-pay coupons or savings cards.

Plaintiff makes much of the fact that Medicare, Medicaid, and the State of Massachusetts

bar drug manufacturers from assisting patients with their co-pays.  There is no allegation that

Abbott violated any of these laws.  The fact that the federal government has made a policy

decision as to co-pay assistance does not bar Abbott from assisting patients with private

insurance nor does it create a legal duty on Abbott's part to require pharmacies or patients to

disclose their use.  As for Massachusetts, since the filing of the Complaint, the Massachusetts

law has been modified to permit manufacturers to provide co-pay assistance, except where there

is a generic version of the brand name drug.  See BUDGET OF MASSACHUSETTS, FISCAL YEAR

2013, §§ 128-131, 201, 226 (2012).  Again, however, there is no allegation in the Complaint that

there are generic versions of Humira and AndroGel that could be substituted for the brand.

### 3.    Plaintiff's Second Theory of Fraud is Equally Flawed

Plaintiff's second theory of fraud is that published wholesale prices for Humira and

AndroGel are misleading because they do not take into account the cost to Abbott in providing

the savings cards to patients.  Plaintiff's Complaint identifies two such "benchmark" prices –

AWP and WAC.  WAC is a published Wholesaler Acquisition Cost, the list price at which

manufacturers sell to drug wholesalers.  WAC is defined in federal statutes and regulations.[5]

AWP is a published price, but there is no allegation that Abbott provides such a price to any

pricing service.  For brand name drugs, AWPs are published prices based on standard mark-ups

over WAC (generally 20% or 25%).  In re Pharm. Indus. Average Wholesale Price Litig., 230

F.R.D. 61, 67-68 (D. Mass. Aug. 16, 2005).  Both are used by TPPs when negotiating

reimbursement rates with pharmacies.  As the Complaint notes, a TPP might agree to reimburse

a pharmacy at AWP – 14% plus a dispensing fee or at WAC + 2%.[6]

The Complaint fails to explain how a patient's use of a savings card should have any

bearing on published AWPs or WACs which relate to the price at which wholesalers or

pharmacies may acquire drugs.  For example, if a pharmacist acquired a drug for $100, it does

---

[5] See Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA"), Pub. L. No.
108-173, 117 Stat. 2066 (2003).  42 U.S.C. §1395w-3a codifies the MMA's WAC definition and 42
U.S.C. § 1396r-8(b)(3)(A)(iii)(II) applies the MMA's WAC definition to Medicaid.

[6] By way of illustration, if the WAC were $100, WAC + 20% produces an AWP of $120.  If the
pharmacy buys at WAC ($100) and is reimbursed by the TPP at AWP – 14%, the reimbursement would
be $103.20.

not matter whether a patient pays some of his or her co-pay using a manufacturer savings card. The pharmacy still had to pay $100 to acquire the drug. Moreover, the size of the co-pay is a function of the patient's contract with his health insurer, and there is no allegation that it has anything to do with the pharmacy's acquisition price. Just like the rebates that a drug manufacturer may provide to TPPs to get on the TPP's lowest tier, discounts provided to patients have nothing to do with the pharmacy's acquisition price. The pharmacy pays $100 regardless of whether the TPP or patient receives a discount or rebate from the manufacturer. For this reason, Medicaid rebate regulations make it clear that co-pay subsidies and rebates to TPPs are exempt from price reporting that measures prices to retail community pharmacies. See 42 C.F.R. 447.

The allegation that Abbott should reduce either of the benchmark prices by the amount of the savings card in light of the use of these benchmarks for reimbursement of pharmacies is also logically flawed. If Abbott lowered the published WAC because of a $20.00 savings card, plaintiff essentially contends that Abbott must give a $40 discount – the $20.00 discount given the patient based on the savings card and then a $20.00 discount to the wholesaler or pharmacy based on lowering the WAC by $20.00. The Complaint cites to nothing that would create such a duty on Abbott's part.[7]

Even if plaintiff's second theory were plausible, there are no facts pled to support it. Plaintiff fails to explain why these "benchmark prices" are misrepresented if they do not account for the value of a savings card or coupon. As noted above, WAC, for example, has nothing to do with the payment that the patient makes to the pharmacy. WAC is defined by federal statute to

_____

[7] As to AWP, lowering the AWP by the value of the savings card also makes little sense. Using the example in footnote 9 above, the pharmacist would still pay $100 for the drug, but using a $20 savings card the AWP would go from $120 to $100 and the pharmacist would be reimbursed at $86 (AWP-14% is $100-$14 = $86.00). The result is reimbursement $14 below what the pharmacist paid for the drug. The foregoing demonstrates why savings cards to patients (just like rebates to TPPs such as plaintiff) logically have no bearing on WAC or AWP, and the Complaint fails to plead sufficient facts showing why they should.

refer to a manufacturer's list price to the wholesaler, not including discounts, rebates or other price reductions. Thus, by definition, a payment that is made to a patient cannot affect a drug's WAC, since such payments are unrelated to the price paid by wholesalers or pharmacies. Moreover, there are no facts pled to show that Abbott publishes WACs or AWPs, how these benchmark prices could have impacted physician decisions on whether to prescribe Humira or AndroGel or how they impacted plaintiff's reimbursement decisions. All of this would need to be spelled out to satisfy Rule 9(b).

### 4. The Complaint Fails to Adequately Plead Intent

Neither theory of fraud advanced by plaintiff adequately pleads facts that give rise to a strong inference of fraudulent intent. "'[I]n addition to alleging the particular details of a fraud, . . . plaintiffs must allege facts that give rise to a strong inference of fraudulent intent.' 'The requisite "strong inference" of fraud may be established either (1) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (2) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.' Plaintiffs may not 'base claims of fraud on speculation and conclusory allegations.'" MLSMK Invs. Co. v. JP Morgan Chase & Co., 737 F. Supp. 2d 137, 142 (S.D.N.Y. 2010) (citations omitted).

There appears to be no dispute that Abbott's programs are nothing more than routine, commercially acceptable discount programs. Coupon programs are a staple of our economy and are widely recognized as beneficial and procompetitive. See Armour & Co. v. United States, 402 F.2d 712, 717-20 (7th Cir. 1998). According to plaintiff, Abbott created the Humira and AndroGel programs "[t]o combat the competition it was facing from less expensive brands" and alternatives, and not to defraud anyone. Compl. ¶¶ 65, 78. Plaintiff's own Complaint demonstrates that co-pay coupons and savings cards are standard, above-board, publicly-known programs. Wankel v. S. Ill. Bancorp, Inc., Civ. No. 06-619, 2007 U.S. Dist. LEXIS 61138, at

*17 (S.D. Ill. Aug. 21, 2007) (rejecting plaintiff's attempt to portray normal course of business as a fraudulent scheme); Aronoff v. DiBruno, No. 1:04-cv-1126, 2005 U.S. Dist. LEXIS 16942, at *24 n.11 (S.D. Ind. July 1, 2005) ("The court believes that a rigorous approach to each element in a RICO case is necessary so that the statute does not become a surrogate for actions regarding . . . routine commercial business disputes . . . .") (citing Midwest Grinding, 976 F.2d at 1022).

Moreover, the terms of the Abbott program are public knowledge and are printed on the coupon itself. Plaintiffs could have asked for the information they now claim to need (e.g., being informed when co-pay cards are being used). The fact that plaintiff did not request detailed information on which patients were using them does not transform Abbott's actions into fraud; and plaintiff can point to nothing preventing it from contractually requiring its insureds or the pharmacies with whom it contracts to advise it as to when a savings card is used.

Manufacturers compete against each other to gain favorable positions on formularies, usually by offering rebates to health insurers. UFCW Local 1776, 620 F.3d at 126, 134. Coupons or savings card programs are simply another form of legitimate competition. Plaintiff is unhappy that here these discounts are being given to the patient rather than plaintiff, and that the discount to the patient allegedly may counteract the impact of rebates plaintiff is receiving from competing manufacturers in order to be placed on a certain tier. But nothing about this suggests any fraudulent intent.

### B. Carpenters Fails to Allege a RICO Enterprise

"[T]o establish liability under § 1962(c), one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person'

referred to by a different name."[8] <u>Cedric Kushner Promotions, Ltd. v. King</u>, 533 U.S. 158, 161 (2001). Section 1962(c) requires "some distinctness between the RICO defendant and the RICO enterprise." <u>Id.</u> at 162 (internal quotation marks and citation omitted); <u>see also</u> <u>Haroco, Inc. v. Am. Nat'l Bank & Trust Co. of Chi.</u>, 747 F.2d 384, 401-02 (7th Cir. 1984). A plaintiff must therefore allege facts to show an enterprise "meaningfully distinct from the entities that comprise it such that the entity sought to be held [under RICO] can be said to have controlled and conducted the enterprise rather than merely its own affairs." <u>Crichton v. Golden Rule Ins. Co.</u>, 576 F.3d 392, 399 (7th Cir. 2008) (citations omitted).

In pleading that the affairs of the enterprise were conducted through a pattern of racketeering activity, it is not enough to merely allege "that the pattern of predicate acts . . . were committed by a firm that has agents or affiliates." <u>Emery</u>, 134 F.3d at 1323-24. "The firm must be shown to use its agents or affiliates in a way that bears at least a family resemblance to the paradigmatic RICO case in which a criminal obtains control of a legitimate (or legitimate-appearing) firm and uses the firm as the instrument of [its] criminality." <u>Id.</u> at 1324; <u>Discon, Inc. v. NYNEX Corp.</u>, 93 F.3d 1055, 1063 (2d Cir. 1996), <u>vacated on other grounds</u>, 525 U.S. 128 (1998). And the plaintiff must allege the existence of "an organization with a structure and goals separate from the predicate acts themselves." <u>Crichton</u>, 576 F.3d at 400.

The Complaint simply alleges the existence of an enterprise on the basis that Abbott uses third parties to administer its savings card programs. This is not enough. <u>See</u> <u>Richmond v. Nationwide Cassel L.P.</u>, 52 F.3d 640, 645 (7th Cir. 1995) (finding complaint alleging a RICO

---

[8] A "person" under RICO includes "any individual or entity capable of holding a legal or beneficial interest in property," and an "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(3), (4). "[D]ifferent RICO sections require plaintiffs to prove different things. For example, under § 1962(c), the plaintiff must show that the enterprise and the defendant are different entities; under § 1962(c), however, the defendant may be the enterprise." <u>Reynolds</u>, 882 F.2d at 1251.

violation "is so scanty and its allegations [as to enterprise] so vague that it . . . fails to satisfy the notice requirement of Rule 8").  Plaintiff labels as "an enterprise" what in reality is simply Abbott conducting its own affairs, with the third-party administrators serving as mere agents. These program administrators that the Complaint identifies—namely, Opus Health, TrialCard, Inc., and Pharmacy Data Management, Inc.—are "merely . . . hireling[s], as is shown by the fact that the only fee [they] received was [their] normal fee" for administering Abbott's co-pay programs.  Bachman v. Bear, Stearns & Co., 178 F.3d 930, 932-33 (7th Cir. 1999).  In other words, the co-pay program administrators' role in perpetrating the alleged racketeering acts "is entirely incidental, differing not at all from what it would be if these agents were the employees of a totally integrated enterprise."  Fitzgerald v. Chrysler Corp., 116 F.3d 225, 227 (7th Cir. 1997).  As a result, Abbott and the administrators and the co-pay programs do not constitute an enterprise.

In Fitzgerald, the Seventh Circuit upheld the dismissal of a RICO claim where the alleged enterprise included dealerships that were not owned by Chrysler.  Id. at 228 ("[Chrysler] has not established dealerships in order to fool car buyers into thinking that they are not dealing with the 'racketeer' Chrysler, or to enable Chrysler to engage in fraud on a scale that would be impossible if it internalized the dealership function.").[9]

Accordingly, the Complaint fails to allege an enterprise.

### C.    Carpenters Lacks Standing to Pursue Any Alleged RICO Violation

Section 1964(c) confers standing upon "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter."  18 U.S.C. § 1964(c).  This requires RICO plaintiffs "to make two related but analytically distinct threshold showings to establish

---

[9] See also Brittingham v. Mobil Corp., 943 F.2d 297, 303 (3d Cir. 1991) (enterprise not sufficiently distinct from defendants where advertising agencies alleged to be part of enterprise "were defendants' agents, and did no more than conduct the normal affairs of the defendant corporations").

standing:  (1) that the plaintiff suffered an injury to business or property; and (2) that the plaintiff's injury was proximately caused by the defendant's violation of section 1962."  In re Schering Plough Corp. Intron/Temodar Consumer Class Action ("In re Schering"), 678 F.3d 235, 243 (3d Cir. 2012) (internal quotation marks omitted); see also Evans v. City of Chicago, 434 F.3d 916, 924 (7th Cir. 2006).

"Civil RICO is a statutory tort, so causation principles that generally apply in tort cases apply in civil RICO cases."  Reynolds, 882 F.2d at 1253 (citation omitted).  "[T]o state a claim under civil RICO, the plaintiff is required to show that a RICO predicate offense 'not only was a "but for" cause of his injury, but was the proximate cause as well.'"  Hemi Grp., LLC v. City of New York, 130 S.Ct. 983, 989 (2010) (quoting Holmes v. Sec. Investor Protection Corp., 503 U.S. 258, 268 (1992)).  A link may not be "too remote, purely contingent, or indirect."  Id. at 989 (internal quotation marks and citation omitted).

In RICO cases involving misrepresentations—e.g., mail and wire fraud cases—"courts often determine whether proximate cause exists by asking whether there was actual reliance on those misrepresentations."  In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig., No. 05-CV-01699, 2012 U.S. Dist. LEXIS 111446, at *218-19 (N.D. Cal. Aug. 2, 2012) (citing UFCW Local 1776, 620 F.3d at 132).  While first-party reliance is not an element of a civil RICO claim, in most cases some form of reliance must be alleged.  Bridge v. Phx. Bond & Indem. Co., 553 U.S. 639, 658 (2008).  Moreover, the allegations of reliance must be "specific and factual in nature," describing "the specific instances when the drug was prescribed, purchased, and administered as a result of the defendant's misrepresentations."  In re Bextra, 2012 U.S. Dist. LEXIS 111446, at *220, 222 (citation omitted); see also In re Actimmune Mktg. Litig., 614 F. Supp. 2d 1037, 1052 (N.D. Cal. 2009).

23

Courts have uniformly required a direct link between the alleged fraudulent conduct and the injury in order to plead a RICO action. See Hemi Grp., 130 S.Ct. at 989; Evans, 434 F.3d at 933 n.27 ("[I]n order for a RICO plaintiff to have standing he must establish that his injuries were caused by a predicate act within the meaning of 18 U.S.C § 1962" (citing Beck v. Prupis, 529 U.S. 494, 500-07 (2000)); In re Schering, 678 F.3d at 248 ("[Plaintiffs] must allege facts sufficient to show that the [drug] which it paid for was prescribed to its members for ineffective off-label uses because of [defendant's] alleged misconduct."); Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc., 171 F.3d 912, 928 (3d Cir. 1999); In re Schering Plough Corp. Intron/Temodar Consumer Class Action, No. 2:06-cv-5774, 2010 U.S. Dist. LEXIS 56621, at *31-32 (D.N.J. June 9, 2010), aff'd, 678 F.3d 235 (3d Cir. 2012).

As noted previously, plaintiff does not contend that Abbott's savings cards, or the use of such cards, are RICO predicate acts. Instead, the alleged predicate acts are non-disclosure that a particular patient is using an Abbott savings card and, alternatively, the failure to deduct the value of a savings card from published prices for Humira and AndroGel. And it is these predicate acts that plaintiff must show are the direct cause of its alleged injury. However, the Complaint fails to plead how either of those alleged acts of omission could be the direct cause of the injury alleged by plaintiff—that is, physicians' prescribing Humira or AndroGel rather than alleged less expensive therapeutic alternatives and plaintiff's decision to reimburse the pharmacists who fill those prescriptions. In fact, plaintiff fails to plead any nexus at all between this conduct and the alleged injury.

Plaintiff's alleged injury here is contingent on several unrelated links in the chain: the decision of a physician, a third-party learned intermediary, to write a prescription for Humira or AndroGel, which is based on the physician's independent clinical judgment about what is best for

24

the individual patient; the patient's decision to fill the prescription; and finally, plaintiff's decision to reimburse for that prescription and at what level of reimbursement. See UFCW Local 1776, 620 F.3d at 134 (no causation where "physicians, PBMs, and PBM Pharmacy and Therapeutics Committees all play a role in the chain between Lilly and TPPs"); United Food & Commercial Workers Cent. Pa. & Reg'l Health & Welfare Fund v. Amgen, Inc., 400 F. App'x 255, 257 (9th Cir. 2010); In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig. ("In re Yasmin"), No. 3:09-md-02100, 2010 U.S. Dist. LEXIS 80758, at *23-27 (S.D. Ill. Aug. 5, 2010); see also Ironworkers Local Union 68 v. AstraZeneca Pharms., LP ("Ironworkers"), 634 F.3d 1352, 1370 (11th Cir. 2011) (Martin, J., concurring) (explaining in concurrence that a full causation analysis is not necessary when "the independent decisions of the physicians and other intermediaries" because they break the chain of causation).[10]

The lack of any direct link between the alleged fraudulent conduct and the harm complained of is further underscored by plaintiff's failure to plead how the conduct actually caused the alleged harm. Plaintiff must show not only that but for the savings card, a different, less expensive drug would have been prescribed (and have been successful in treating the patient's problem), but also that but for the failure to disclose that a patient used a savings card, plaintiff would not have reimbursed a pharmacist for filling a prescription for Humira or AndroGel. In other words, had plaintiff known that the patient was being prescribed Humira and AndroGel and was using a savings card (as opposed to a prescription for Humira or AndroGel without a savings card), plaintiff would not have been injured. Plaintiff never pleads what

---

[10] Additionally, in determining whether an injury is contingent on other factors the courts analyze whether the other factors lead to the harm. See Int'l Bhd. Of Teamsters, Local 734 Health & Welfare Trust Fund v. Philip Morris Inc., 196 F.3d 818, 827 (7th Cir. 1999) ("Here, the smokers alone bought and used tobacco products; plaintiffs may pay the resulting bills directly to hospitals and physicians, but this does not produce a direct injury, for physicians and hospitals are not committing any wrong (or conspiring with anyone else who is) against either the smokers or their insurers.").

physicians would have done differently or what plaintiff would have done differently if notified

that a savings card was being used. In fact, plaintiff concedes it was aware of the program and,

at least according to the Complaint, apparently took no steps to require notification by

pharmacists or patients.

Courts have nearly universally rejected RICO claims by TPPs that depend upon the

prescribing decisions of thousands of non-party physicians. In re Yasmin, 2010 U.S. Dist.

LEXIS 80758, at *22-23; UFCW Local 1776, 620 F.3d at 135 ("The nature of prescriptions,

however, means that this theory of causation is interrupted by the independent actions of

prescribing physicians, which thwarts any attempt to show proximate cause through generalized

proof."); Amgen, Inc., 400 F. App'x 255. In a case involving RICO claims by TPPs alleging that

a pharmaceutical manufacturer injured them by misrepresenting the safety and efficacy of its

products, the Ninth Circuit held that "the complaint failed to plead a cognizable theory of

proximate causation that links Amgen's alleged misconduct to Appellant's alleged injury."

Amgen, Inc., 400 F. App'x at 257. (Plaintiffs' "attenuated causal chain . . . involved at least four

independent links," including "doctors' decisions to prescribe Aranesp and Epogen for [off-

label] uses."); Se. Laborers Health & Welfare Fund v. Bayer Corp., 444 F. App'x 401, 407-09

(11th Cir. 2011) (rejecting a TPP's attempt to establish direct injury by arguing that the

prescription drug at issue was medically unnecessary under its plan because the TPP would have

still had to rely upon decisions by intermediaries, such as prescribing physicians, to evaluate the

medicine's appropriateness); see also Ironworkers, 634 F.3d at 1370.[11]

---

[11] Courts that have considered the issue have held that a TPP's claim that depends on the independent decisions of thousands of prescribing physicians is too attenuated to satisfy RICO's proximate cause requirement. In re Bextra, 2012 U.S. Dist. LEXIS 111446, at *218-24; Health Care Serv. Corp. v. Olivares, No. 2:10-CV-221-TJW-CE, 2011 U.S. Dist. LEXIS 117750, at *14-16 (E.D. Tex. Sept. 2, 2011), magistrate report adopted, 2011 U.S. Dist. LEXIS 112544 (E.D. Tex. Sept. 30, 2011); In re Yasmin, 2010 U.S. Dist. LEXIS 80758, at *23-26 ("[T]he causal link necessarily involves the decision

Plaintiff does not allege that the true gatekeepers here—namely, prescribing physicians—have any financial incentive in prescribing AndroGel or Humira as a result of Abbott's savings card program. Nor does Plaintiff allege that doctors or pharmacists relied on any improper instruction or misrepresentation "as opposed to relying on the professional's own judgment and expertise, when prescribing the drugs" or filling the prescriptions. Health Care Serv. Corp. v. Pfizer, No. 10-0221, 2012 U.S. Dist. LEXIS 89759, at *9 (E.D. Tex. Apr. 23, 2012) (dismissing civil RICO mail and wire fraud claims where plaintiff sufficiently alleged third-party reliance but failed to allege that any doctor or other health care professional relied on misrepresentations made by the defendant in promoting use).

The number of variable factors here is daunting. The trier of fact would have to determine: why a patient was prescribed Humira or AndroGel; if the physician considered a therapeutic alternative medically appropriate; if the patient considered using a therapeutic alternative; what the co-pay would have been for Abbott's drug without the savings card; what the co-pay would have been for the therapeutic alternative; what role the savings card played, if any, in the patient's decision to purchase the defendant's drug; whether that patient would still have filled a prescription for the defendant's drug even in the absence of a savings card; and finally, why plaintiff reimbursed for Humira and AndroGel when it knew about the programs. Courts have found factors like these to break causation/proximate cause on a motion to dismiss. See In re Yasmin, 2010 U.S. Dist. LEXIS 80758, at *29 ("In the instant case, attempting to determine what the Plaintiffs would have done and how effective patient education would have

_____

making process of the patient, the prescribing physician, and the third party payor. This demonstrates the attenuation in Plaintiffs' civil RICO claims."); Pa. Emps. Benefit Trust Fund v. AstraZeneca Pharm. LP, No. 6:09-cv-5003-Orl-22DAB, 2009 U.S. Dist. LEXIS 76555, at *16-17 (M.D. Fla. July 18, 2009); In re Schering Plough Corp. Intron/Temodar Consumer Class Action, No. 2:06-cv-5774, 2009 U.S. Dist. LEXIS 58900, at *86-90 (D.N.J. July 10, 2009); Ironworkers Local Union No. 68 v. AstraZeneca Pharms. LP, 585 F. Supp. 2d 1339, 1344 (M.D. Fla. 2008).

been is 'hopelessly speculative' and militates against finding that the alleged injury is sufficiently direct." (citation omitted)).[12]

Courts have also found that there is no proximate cause when the alleged harm is speculative, uncertain, and threatens to overrun the RICO litigation. See Anza v. Ideal Steel Supply Corp., 547 U.S. 452, 459-61 (2006) ("The element of proximate causation recognized in Holmes is meant to prevent these types of intricate, uncertain inquiries from overrunning RICO litigation."); see also Steamfitters, 171 F.3d at 933 (granting motion to dismiss); Rubloff Dev. Grp., Inc. v. SuperValu, Inc., No. 10 C 3917, 2012 U.S. Dist. LEXIS 41304, at *23 (N.D. Ill. Mar. 27, 2012) ("One of the factors weighing against standing is difficulty in ascertaining the amount of the Plaintiffs' damages that are attributable to Defendants' wrongful conduct."); In re Yasmin, 2010 U.S. Dist. LEXIS 80758, at *25 (damages were too speculative when "the Court would have to delve into the specifics of each physician patient relationship to determine what damages were caused by Bayer's alleged fraudulent conduct, as opposed to what damages were caused by the physician's independent medical judgment.").

The Seventh Circuit's ruling in BCS Services, Inc. v. Heartwood 88, LLC does not counsel differently. In that case, the court reversed a summary judgment ruling that plaintiff's

---

[12] Plaintiffs cannot rely upon aggregate proof to support their assertion that physicians would have prescribed alternative therapies. As the Second Circuit has explained, doctors make decisions to prescribe a particular medicine based on their independent medical judgment. That decision can be based on a number of complex, physician/patient specific factors, making aggregate proof impermissible. See UFCW Local 1776, 620 F.3d at 135. As one district court noted, TPP claims "structured on the foundation of many thousands of conceptually separate claims, coordinated and aggregated by" the plaintiff are barred because they "would necessarily require individualized consideration of the circumstances of each case." In re Zyprexa Prods. Liab. Litig., 671 F. Supp. 2d 397, 433, 453 (E.D.N.Y. 2009). Numerous other district courts have refused to allow TPPs to rely on aggregate proof of what prescribing physicians would have done but for defendant's conduct. Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP, No. 08-CV-0179, 2011 U.S. Dist. LEXIS 26857, at *43-44 (E.D.N.Y. Feb. 16, 2011), magistrate report adopted, 2011 U.S. Dist. LEXIS 36454 (E.D.N.Y. Mar. 30, 2011); In re Yasmin, 2010 U.S. Dist. LEXIS 80758, at *24-26; In re Vioxx Prods. Liab. Litig., Civ. No. 05-3700, 2010 U.S. Dist. LEXIS 142767, at *21-25 (E.D. La. Mar. 31, 2009); Se. Laborers Health & Welfare Fund v. Bayer Corp., 655 F. Supp. 2d 1270, 1283 (S.D. Fla. 2009); Pa. Emps. Benefit Trust Fund, 2009 U.S. Dist. LEXIS 76555, at *16-17; In re Schering, 2009 U.S. Dist. LEXIS 58900, at *86-90.

evidence of the causal link between the fraud and the injury was too "tenuous." 637 F.3d 750, 752 (7th Cir. 2011). The facts alleged in that case, however, are quite distinguishable from the present case. In BCS, defendants admitted they conspired to rig the bidding at auctions of Cook County tax liens by secretly packing the room with cooperating buyers. Plaintiffs were unsuccessful bidders who were directly injured by the defendants' scheme "to obtain a larger share of tax liens." Id. at 756. The BCS defendants argued that that their bid-rigging was not the proximate cause of any injury because it was still possible that plaintiffs may not have been successful bidders and that plaintiffs' statistical evidence was insufficient.

The Seventh Circuit disagreed, finding that it was not dealing with a case of indirect causation implicating proximate cause, as in Holmes, Anza, and Hemi Group. See id. at 754, 756. Whether the plaintiffs' injury was sufficiently direct to satisfy RICO's proximate cause requirement was a question already addressed by the Supreme Court in Bridge v. Phoenix Bond & Indemnity Co. (Bridge and BCS arose from the same case). There was no independent decision-making process that interrupted causation in Bridge. See 553 U.S. at 658. As the Supreme Court explained in Hemi Group: "Because of the zero-sum nature of the auction [in Bridge], and because the county awarded bids on a rotational basis, each time a fraud-induced bid was awarded, a particular legitimate bidder was necessarily passed over." Hemi Grp., 130 S.Ct. at 992 (citation omitted). When the case returned to the district court, the evidence had shown that bids were not awarded on a rotational basis, but on a random basis, which the Seventh Circuit concluded did not render the chain of causation indirect. See BCS, 637 F.3d at 757. As the Seventh Circuit explained, from a statistical perspective, random and rotational selection should yield approximately the same results. Id. at 760.

Unlike in <u>BCS</u>, it is the plaintiff here who "implausibl[y] speculat[es]" that Abbott's alleged fraud caused patients to be prescribed AndroGel or Humira and plaintiff to reimburse for these drugs despite the indisputable involvement of the physician decision-maker in the process (and a myriad of factors that may lead to an AndroGel or Humira prescription) and plaintiff's decision to reimburse for those prescriptions. <u>Id.</u> at 757.

In light of its inability to allege an adequate, plausible basis for causation, plaintiff's RICO claims should be dismissed.

**D. Plaintiff Fails to Adequately Allege Injury to its "Business or Property" Under 18 U.S.C. § 1964(c)**

Plaintiff has not adequately alleged a loss of "business or property" due to reimbursing for Humira and AndroGel prescriptions rather than alleged less expensive therapeutic alternatives. Plaintiff does not allege any specifics about the net price to plaintiff for Humira, AndroGel, and alleged therapeutic alternatives. In addition, plaintiff fails to allege that it did not recoup the alleged added cost of reimbursing Humira or AndroGel through the premiums paid by and on behalf of patients prescribed those drugs (who used a savings card).

As noted above, plaintiff concedes that it is aware of co-pay assistance programs (they are "open and notorious" and advertised to consumers), and cannot deny that plaintiff controls the terms of its plans, including whether to allow its members to use co-pay assistance and what to charge in premiums and co-pays for that privilege. Plaintiff's failure to allege that it did not recover its alleged losses through premiums means it has not pled a plausible theory of injury. <u>Ironworkers</u>, 634 F.3d at 1364-69 (affirming dismissal of RICO claims in part because TPPs "have not pled any facts to suggest plausibly that they did not charge their enrollees premiums or, in turn, adjust those premiums to compensate for this known risk," and "to the extent the insurers' payments for medically unnecessary or inappropriate Seroquel prescriptions exceeded

the premiums they collected, AstraZeneca should not be held liable for the insurers' actuarial errors"); Olivares, 2011 U.S. Dist. LEXIS 117750, at *18 ("[T]here is nothing in the complaint to suggest that HCSC set its premiums in other than the conventional manner outlined by the court in Ironworkers. By placing Geodon, Lyrica, and Zyvox on its formulary, HCSC assumed the risk that some of its reimbursements would be for off-label uses—even those uses that may have been a product of the alleged marketing fraud.").

Plaintiff also has not established that it suffered an "economic injury" because it cannot allege that it paid for unsafe or ineffective medications. Numerous courts have dismissed RICO claims where TPP-plaintiffs did not allege that they paid for a medication that was unsafe or ineffective for its prescribed use. Plaintiff makes no such allegations here. Olivares, 2011 U.S. Dist. LEXIS 117750, at *17 ("Although HCSC contends that it has had to pay for more prescriptions because of the off-label usage, HCSC does not allege that any physician, had he or she known all the true information about Geodon, Lyrica, or Zyvox, would not have prescribed the drugs under the standards of sound medical practice because the drugs actually were unsafe or ineffective in treating their patients' conditions.").[13]

Here, Plaintiff does not even attempt to allege that any of the medications at issue were unsafe or ineffective. To the contrary, its theory – that the medications at issue are "therapeutically equivalent" to other (cheaper) drugs – precludes any such showing. "[T]he fact

---

[13] See also In re Schering Plough Corp. Intron/Temodar Consumer Class Action, 2010 U.S. Dist. LEXIS 56621, at *26 ("To state cognizable injury, it is not enough that Named Plaintiffs paid for off-label prescriptions . . . . [T]o state that they suffered injury-in-fact, Plaintiffs must 'allege facts to support the theory that the named TPPs actually paid for one or more of the Subject Drugs to treat an off-label indication for which the drug was ineffective.'") (citation omitted); In re Schering Plough Corp. Intron/Temodar Consumer Class Action, 2009 U.S. Dist. LEXIS 58900, at *73 ("Plaintiffs' allegations concerning the availability of cheaper and more effective alternatives to the Subject Drugs are wholly inadequate to support RICO injury. RICO injury of this type may only be pled by alleging that the drugs actually purchased by a plaintiff were 'inferior on some level or worth less than what [plaintiff] paid for it.' The Complaint contains no such allegations. Therefore, to the extent that Plaintiffs allege that they have suffered a concrete financial loss to business or property because they purchased the Subject Drugs off-label rather than cheaper alternatives, their theory of injury is not cognizable under RICO.").

that the payer merely paid for more expensive drugs does not suffice." Ironworkers, 634 F.3d at 1360. Plaintiff reimburses the same amount for any prescription no matter who pays the co-pay.

### E.    Plaintiff Has Not Pled a Conspiracy Under § 1962(d)

The "failure to make out a substantive RICO claim requires dismissal of a conspiracy claim based on the same nucleus of operative fact." Meier v. Musburger, 588 F. Supp. 2d 883, 911-12 (N.D. Ill. 2008) (collecting cases). This is because "the touchstone of liability under § 1962(d) is an agreement to participate in an endeavor which, if completed, would constitute a violation of the substantive statute." Goren, 156 F.3d at 732 (emphasis added); see also Salinas v. United States, 522 U.S. 52, 65 (1997).

Plaintiff's RICO conspiracy claims are wholly dependent on its § 1962(c) claims. Accordingly, any alleged agreement between Abbott and the administrators to commit acts that fail to constitute a pattern of racketeering activity cannot support a conspiracy claim.

## III.    PLAINTIFF'S ROBINSON-PATMAN ACT CLAIMS FAIL AS A MATTER OF LAW

There are four separate and independent grounds to dismiss Plaintiff's antitrust claims under Section 2(c) of the RP Act. Plaintiff has neither an antitrust injury nor antitrust standing. In addition, plaintiff has not stated a claim under Section 2(c).

### A.    Plaintiff Does Not Have An Antitrust Injury or Antitrust Standing

Section 2(c) of the RP Act addresses price discrimination occurring in a transaction in the guise of (1) the payment (or receipt) of (2) a commission, brokerage fee or other compensation (or an allowance or discount) other than for services rendered (3) to either "the other party to such transaction" or to an agent, representative or other intermediary ("where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction"). 15 U.S.C. § 13(c). The Seventh Circuit has explained that the purpose of Section

32

2(c) is "to prevent discriminatory rebates granted large sellers under the guise of 'brokerage fees' never actually earned."  Lupia v. Stella D'Oro Biscuit Co., 586 F.2d 1163, 1169 (7th Cir. 1978). Other circuits share the Seventh Circuit's understanding that Section 2(c) is designed to prevent price discrimination.  For example, the First Circuit has explained that Section 2(c) "prevent[s] violation of the basic § 2(a) price discrimination prohibition under different guise."  Allen Pen Co. v. Springfield Photo Mount Co., 653 F.2d 17, 25 (1st Cir. 1981).

In the Seventh Circuit, a plaintiff may not sue under an antitrust law unless the plaintiff has both an "antitrust injury" and "antitrust standing" under the antitrust law asserted.  Kochert v. Greater Lafayette Health Servs., Inc., 463 F.3d 710, 716 (7th Cir. 2006).  Plaintiff has neither antitrust injury nor antitrust standing under Section 2(c).

### 1.    Plaintiff Does Not Have an Antitrust Injury Under Section 2(c)

The Seventh Circuit defines an "antitrust injury" as an injury "'[1] of the type the antitrust laws were intended to prevent' and [2] 'reflect[ing] the anticompetitive effect of either the violation or of anticompetitive acts made possible by the violation.'"  Tri-Gen Inc. v. Int'l Union of Operating Eng'rs, 433 F.3d 1024, 1031 (7th Cir. 2006).  In considering whether an alleged injury is an "antitrust injury," the first step for a court is to delineate "the *type* of interests protected by the antitrust laws."  Greater Rockford Energy & Tech. Corp. v. Shell Oil Co., 998 F.2d 391, 395 (7th Cir. 1993).[14]

The Seventh Circuit spoke directly in Grace v. E.J. Kozin, 538 F.2d 170 (7th Cir. 1976) about the type of interest protected by Section 2(c) when an employee is bribed to breach his fiduciary duty to his employer and binds the employer to an unfavorable transaction.  Not

---

[14] The second step is determining that, "but for" the alleged violation, the injury would not have occurred. Greater Rockford Energy, 998 F.2d at 395.

surprisingly, given the purpose of the antitrust laws, it is the avoidance of price discrimination between competitors in order to protect the competitive process.

In <u>Grace</u>, the wholesaler plaintiff and wholesaler defendant were competitors as purchasers and sellers of seafood products. Plaintiff's employee and defendant agreed that the plaintiff's employee would secretly receive one-half of defendant's profits on any sales to plaintiff. In return, the plaintiff's employee would convince his employer, the plaintiff, to buy from defendant. <u>Grace</u>, 538 F.2d at 171-72. Analyzing whether plaintiff suffered "an injury to its business cognizable under the antitrust laws," the Seventh Circuit held that plaintiff had an injury "entitled to redress under Section 2(c)" because there was an injury in fact (an overpayment by plaintiff to defendant) <u>and</u> this price was higher than the price the defendant paid for seafood when defendant was competing with the plaintiff:

> [Q]uite logically, the district court concluded that as a result of [defendant's] payments to [plaintiff's employee] of commissions on sales to [plaintiff], [plaintiff] paid a price for the products it purchased from [defendant] which was higher than it would otherwise have paid except for the [amount] in illegal commissions which [defendant] paid [plaintiff's employee] . . . . Further, the net effect of [defendant's] bribery was indirect price discrimination with regard to the prices charged [plaintiff] by suppliers potentially common to [defendant] and [plaintiff]. Thus because of [employee's] interest in the transactions, [plaintiff] acquired goods at a price higher than that paid by [defendant] or than that which would have been paid by [plaintiff] purchasing independently. . . .

<u>Grace</u>, 538 F.2d at 173-74.

In other words, bribery of plaintiff's employee in <u>Grace</u> caused plaintiff to pay more for the goods it purchased and sold than its competitor (defendant) paid for the same goods and sold in competition with plaintiff. The interest at stake was price discrimination between competitors—not mere overpayment by plaintiff—and the price discrimination's impact on competition. This Court has explained that "[w]hen a buyer purchases goods at a higher price or

34

a seller sells goods at a lower price because of the bribe, there may be price discrimination or antitrust injury. But the cases in this circuit indicate that the simple fact of commercial bribery does not make all related injury antitrust injury." Miyano Mach. U.S.A., Inc. v. Zonar, No. 92 C 2385, 1993 U.S. Dist. LEXIS 963, at *26 (N.D. Ill. Jan. 29, 1993). In this district, a Section 2(c) plaintiff that fails to allege a competitive injury—as opposed to alleging mere overpayments as the result of defendant's bribery of plaintiff's employee—cannot proceed under Section 2(c) even though the bribe "literally fit[s] within the language of the statute." Bunker Ramo Corp. v. Cywan, 511 F. Supp. 531, 533-35 (N.D. Ill. 1981) (explaining that the "key factor" in Grace was that plaintiff and defendant "were competitors and thus [plaintiff's] competitive injury was cognizable under the antitrust laws"). See also Goold Elecs. Corp. v. Galaxy Elecs., Inc., No. 91 C 5989, 1991 U.S. Dist. LEXIS 18421, at *5 (N.D. Ill. Dec. 31, 1991) (an injury causally related to a Section 2(c) violation is not an antitrust injury "unless it is attributable to an anti-competitive aspect of the practice under scrutiny"); Miyano, 1993 U.S. Dist. LEXIS 963, at *27 (a plaintiff's injury must result from "the anticompetitive nature of the bribe").

But in this case, plaintiff cannot allege price discrimination between it and its competitors. Plaintiff concedes that the Abbott savings cards apply to it and to every other TPP. See Compl. ¶¶ 3, 20, 125, 193. Section 2(c) requires a plaintiff to be able to allege "how competition was adversely affected" by a defendant's alleged commercial bribery. Quantum Grinding Corp., Inc. v. Supreme Screw Prods., Inc., No. 03 C 0722, 2003 U.S. Dist LEXIS 18787, at *8 (N.D. Ill. Oct. 20, 2003). Plaintiff cannot make that allegation in light of its existing allegations.[15]

---

[15] Plaintiff's inability to allege an antitrust injury dooms both its claim for damages under Section 4 of the Clayton Act and its claim for injunctive relief under Section 16 of that Act. Local Beauty Supply, Inc. v. Lamaur, Inc., 787 F.2d 1197, 1204 (7th Cir. 1986) ("[T]o bring a claim for injunctive relief under § 16 of the Clayton Act a plaintiff must demonstrate an antitrust injury.").

### 2. Plaintiff Does Not Have Antitrust Standing Under Section 2(c)

An antitrust plaintiff might have an antitrust injury but not have antitrust standing. Kochert, 463 F.3d at 718. The plaintiff must also be the person that can "most efficiently vindicate the purposes of the antitrust laws." Serfecz v. Jewel Food Stores, 67 F.3d 591, 597-98 (7th Cir. 1995). Six factors are used to make that assessment.[16] Merely one of the six factors can weigh particularly heavily in a specific case. See Kochert, 463 F.3d at 718. As discussed above, the third factor weighs against plaintiff. So too the first and fourth factors.

This case involves the sale of medicines prescribed by physicians. The transaction between TPPs and pharmacists occurs after the prescription is written. The alleged bribe of patient members is thus remote from the alleged "harm" to plaintiff when a physician prescribes Humira or AndroGel rather than alleged less expensive therapeutic alternatives. The first factor therefore weighs against plaintiff having antitrust standing.

The fourth factor also weighs against plaintiff. Plaintiff complains that the Abbott savings cards cause Humira and AndroGel to be used instead of less expensive drugs. The obvious category of persons allegedly affected by the sales that are allegedly lost to Abbott as a result of the savings cards are the manufacturers of the purportedly competing medicines. If the antitrust laws are to be vindicated, they should be vindicated by Abbott's purported competitors.

---

[16] The six factors for the "case-by-case analysis" of antitrust standing are: (1) the causal connection between the alleged violation and plaintiff's harm; (2) improper motive; (3) whether plaintiff's injury is the type Congress sought to redress with the antitrust laws; (4) the directness between the injury and the market restraint; (5) the speculative nature of damages; and (6) the risk of duplicative recoveries or complex damages apportionment. Sanner v. Bd. of Trade of Chi., 62 F.3d 918, 927 (7th Cir. 1995).

Considering all of the factors of antitrust standing, plaintiff is not the person that can most efficiently vindicate the antitrust laws. The Section 2(c) claims should therefore be dismissed with prejudice.[17]

**B.      Plaintiff Has Failed to State a Claim Under Section 2(c)**

**1.      Plaintiff's Members Are Not Its Agents or Other Type of Fiduciary**

Plaintiff's allegation that its members "qualify" as its agents, representatives and intermediaries, see Compl. ¶ 192, does not satisfy the language of Section 2(c) for any of those three categories. It also does not satisfy the requirements of the Seventh Circuit's decision in Grace.[18]

Plaintiff cannot plausibly allege either an agency relationship or some other fiduciary relationship between plaintiff and its members. The Seventh Circuit succinctly explained in Grace that bribery under Section 2(c) concerns corruption of agency and fiduciary relationships:

> Congress concluded that under certain circumstances, it is an unfair trade practice for an agent to serve two masters. . . . One of the purposes of this Section is to protect the integrity of the principal-agent relationship where a violation has an anti-competitive effect.

Grace, 538 F.2d at 173. The protection of the principal-agent relationship in Grace means the protection of a fiduciary duty.[19] When the plaintiff's employee in Grace asserted that his

---

[17] For purposes of plaintiff's claim for injunctive relief, the Court should consider the first, third, and fourth factors. See Sw. Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n, 830 F.2d 1374, 1377-78 (7th Cir. 1987). Given plaintiff's remoteness from the competition between Abbott and the manufacturers of purported alternative medicines, plaintiff lacks antitrust standing to pursue injunctive relief.

[18] For purposes of this motion to dismiss only, Abbott assumes plaintiff is a "party" to a pharmacist's sale of Abbott's medicine to one of plaintiff's members within the meaning of Section 2(c) and further assumes that a co-pay coupon is a commission, brokerage, or other compensation (or an allowance or discount in lieu thereof) within the meaning of Section 2(c).

[19] The employee in Grace breached his fiduciary duties to plaintiff in several ways. First, the employee accepted commissions from defendant on the sales he arranged from defendant to plaintiff. Second, he formed a joint venture with defendant to purchase goods from plaintiff's suppliers for re-sale to plaintiff. Third, the joint venture also purchased goods for re-sale to third parties. The commissions received on

commissions on defendant's sale to plaintiffs were permitted by Section 2(c) and paid to him in exchange for his valuable services, the Seventh Circuit rejected the asserted statutory defense: "This defense is inapplicable where, as here, an agent violates his fiduciary duty." Grace, 538 F.2d at 174.[20]

An agency relationship requires the agent's consent to act on behalf of the principal and the principal's right to control the agent's acts. RESTATEMENT (THIRD) OF AGENCY § 1.01; Clarendon Nat'l Ins. Co. v. Medina, 645 F.3d 928, 935 (7th Cir. 2010) (following Restatement (Third) of Agency) ("Generally, an agency relationship arises when 'one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act."). A fiduciary relationship (other than an agency relationship) arises either as a matter of law (such as an attorney-client relationship) or from special circumstances in which one party places trust in another so that the fiduciary gains superiority and control over the other party. Ransom v. A.B. Dick Co., 289 Ill. 663, 672, 682 N.E.2d 314, 321 (Ill. App. Ct. 1997). A contractual relationship by itself does not establish a fiduciary relationship. R.J. Mgmt. Co. v. SRLP Dev. Corp., 346 Ill. App. 957, 968, 806 N.E.2d 1074, 1083-84 (Ill. App. Ct. 2004).

The gist of plaintiff's allegations is that plaintiff creates tiered co-payments to influence patients to accept certain prescription medicines and to decline others. See Compl. ¶¶ 2, 27, 28. Those attempts to influence do not constitute "control" by plaintiff for purposes of an agency

---

the joint venture's re-sales to plaintiff were the basis for the employee's liability and plaintiff's damages under Section 2(c). The joint-venture's re-sales to third parties were the basis for the employee's liability and plaintiff's damages under the common law. Grace, 538 F.2d at 174-75.

[20] A recent summary of circuit court cases concluded that "cases finding commercial bribery in violation of Section 2(c) all involve the corruption of an agency or employment relationship." Bridges v. MacLean-Stevens Studios, Inc., 201 F.3d 6, 11-12 (1st Cir. 2000) (citing Grace and decisions of other circuit courts).

relationship. They also do not establish plaintiff's subservience and its "trust and confidence" in its member's handling of plaintiff's affairs.

A fiduciary relationship must be pleaded with specificity and proven by clear and convincing evidence. Martin v. State Farm Mut. Auto. Ins. Co., 348 Ill. App. 3d 846, 852, 808 N.E. 2d 47, 52 (Ill. App. Ct. 2004). The contractual relationship alleged by plaintiff could not be reconciled with either an allegation of "control" over the members or an allegation of trust and confidence in, and subservience to, the members.

Nor can plaintiff plausibly plead that patients insured by plaintiff are "intermediaries" under Section 2(c). The section requires an "intermediary" either (1) to be "acting in fact for or in behalf" of a party to a transaction or (2) "to be subject to the direct or indirect control" of a party to the transaction. 15 U.S.C. § 13(c). An intermediary acts "in fact for or in behalf of" a party when the intermediary acts primarily for the benefit of the party rather than primarily for her own benefit; it is not sufficient for an intermediary to act incidentally for the benefit of the party. Fuchs Sugars & Syrups, Inc. v. Amstar Corp., 447 F. Supp. 867, 879-80 (S.D.N.Y. 1978), rev'd on other grounds, 602 F.2d 1025 (2d Cir. 1979). There is no allegation that patients are acting for the benefit of plaintiff when they fill their prescriptions for Humira or AndroGel, nor would such an allegation be plausible, since patients presumably fill their prescriptions to improve their health. As for intermediaries that are "subject to the direct or indirect control" of a party to a transaction (the second standard under Section 2(c)), plaintiff's allegation that plaintiff controls how members "seek[ ] payment [from plaintiff] for the selected medications," Compl. ¶ 192, has nothing to do with controlling how patients satisfy their co-pays. Indeed, plaintiff's complaint is that it does not currently control how those co-pays are satisfied.

39

### 2. The Savings Cards Are Not "Secret"

Plaintiff's concession that the savings cards are open and notorious precludes a claim under Section 2(c).

The Federal Trade Commission enforces Section 2(c) and has concluded that payments that do not involve secret compensation "almost certainly do not constitute commercial bribery." See Letter from FTC Bureau of Competition to Maritz, Inc. (June 21, 1994), reported in 47 Antitrust & Trade Reg. Rep. (BNA) 16 (July 5, 1984). Courts have reached the same conclusion for more than sixty-five years. See, e.g., Fitch v. Ky.-Tenn. Light & Power Co., 136 F.2d 12, 16 (6th Cir. 1943) ("[T]he payment of the secret commissions to [the employee of the purchaser] was an unfair trade practice [in violation of Section 2(c).]"); Bridges v. MacLean-Stevens Studios, Inc., 35 F. Supp. 2d at 26 n.10; cf. Lupia, 586 F.2d at 1170 (rejecting application of Section 2(c) to indirect price concessions to favored retail chain stores that were "straightforward and not disguised in any manner"); Augusta News Co. v. Hudson News Co., 269 F.3d 41, 46 (1st Cir. 2001) ("All that we have is a payment—effectively a price reduction to the buyer—that was openly made . . . .").

Plaintiff's Section 2(c) claims should therefore be dismissed. The flaws of plaintiff's Complaint cannot be cured by amendment. Dismissal on any of the four independent grounds should therefore be "with prejudice."

### CONCLUSION

For the reasons set forth herein, plaintiff's Complaint should be dismissed without leave to replead.

Respectfully submitted,

Dated: September 17, 2012                ABBOTT LABORATORIES


                                         */s/   William F. Cavanaugh, Jr.*
                                         William F. Cavanaugh, Jr.
                                         Thomas W. Pippert
                                         Patterson Belknap Webb & Tyler LLP
                                         1133 Avenue of the Americas
                                         New York, NY 10036
                                         Tel. (212) 336-2000
                                         Fax (212) 336-2222

                                         Samantha L. Maxfield
                                         Winston & Strawn LLP
                                         35 W. Wacker Drive
                                         Chicago, IL 60601
                                         Tel. (312) 558-5600
                                         Fax (312) 558-5700

                                         *Counsel for Defendant*
                                         *Abbott Laboratories*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 17, 2012, a copy of the foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/  William F. Cavanaugh, Jr.*