**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NEW ENGLAND CARPENTERS | ) | |
| HEALTH AND WELFARE FUND, | ) | |
| | ) | No. 1:12-cv-01662 |
| Plaintiff, | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| v. | ) | |
| | ) | Magistrate Judge Mary M. Rowland |
| ABBOTT LABORATORIES, | ) | |
| | ) | |
| Defendant. | ) | |

## ABBOTT LABORATORIES' REPLY IN SUPPORT OF ITS MOTION TO DISMISS THE COMPLAINT

# **TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ...........................................................................................1

I.      PLAINTIFF'S RICO CLAIMS FAIL FOR AT LEAST FOUR REASONS......................2

     A.      Plaintiff Fails to Identify Any Fraud.........................................................2

         1.      There is No Plausible Allegation of Fraud ..................................2

         2.      Plaintiff's "Waiver of Co-pay" Argument Fails ...........................3

         3.      WAC and AWP Are Irrelevant ....................................................5

     B.      Plaintiff Fails to Plead Mail and Wire Fraud with the Requisite Particularity ........6

         1.      The Complaint's Lack of Particularity Has Little to Do with Plaintiff's Lack of Knowledge..........................................................6

         2.      Plaintiff Must Plead Intent to Defraud.......................................7

     C.      Plaintiff Lacks RICO Standing ...................................................................8

         1.      Plaintiff Suffered No Injury to its "Business or Property" ..........................9

         2.      Plaintiff Fails to Allege Reliance Sufficient for "But for" Causation .........9

         3.      There Are Too Many Links in Plaintiff's Causal Chain ...........................11

         4.      Foreseeability By Itself is Not Sufficient....................................................14

     D.      Plaintiff Fails to Plead a RICO Enterprise .............................................15

         1.      The Alleged Enterprise's Affairs Are Not Distinct from Normal Business Affairs .................................................15

         2.      Plaintiff Has Not Adequately Pled a "Common Purpose".......................17

II.      PLAINTIFF'S ROBINSON-PATMAN ACT CLAIMS SHOULD BE DISMISSED ......18

     A.      Plaintiff Does Not Have an Antitrust Injury ............................................19

     B.      Plaintiff Does Not Have Antitrust Standing .............................................21

     C.      Plaintiff Has Failed to State a Claim Under Section 2(c) .....................................22

     D.      Abbott's Co-pay Programs Are Not a Secret.........................................24

CONCLUSION.......................................................................................................................25

i

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

2660 Woodley Road Joint Venture v. ITT Sheraton Corp.,
    369 F.3d 732 (3d Cir. 2004) ............................................................................19, 22

Anza v. Ideal Steel Supply Corp.,
    547 U.S. 451 (2006) ...................................................................................... 14

Bachman v. Bear, Stearns & Co.,
    178 F.3d 930 (7th Cir. 1999) .............................................................................17

BCS Services, Inc. v. Heartwood 88, LLC,
    637 F.3d 750 (7th Cir. 2011) .............................................................................14

Beiersdorf, Inc. v. International Outsourcing Services, LLC,
    No. 07-c-888, 2008 U.S. Dist. LEXIS 36689 (E.D. Wis. Apr. 30, 2008) ........................16, 17

Boyle v. United States,
    556 U.S. 938 (2009) ...........................................................................15, 17, 18

Bridge v. Phoenix Bond & Indem. Co.,
    553 U.S. 639 (2008) .......................................................................9, 10, 13, 14

Brittingham v. Mobil Corp.,
    943 F.2d 297 (3d Cir. 1991) .............................................................................15

Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,
    429 U.S. 477 (1977) ......................................................................................19

Bunker Ramo Corp. v. Cywan,
    511 F. Supp. 531 (N.D. Ill. 1981) ......................................................................20

Cedric Kushner Promotions, Ltd. v. King,
    533 U.S. 158 (2001) ..................................................................................... 15

Clarendon Nat'l Ins. Co. v. Medina,
    645 F.3d 928 (7th Cir. 2010) .............................................................................23

Crichton v. Golden Rule Ins. Co.,
    576 F.3d 392 (7th Cir. 2009) .........................................................................16, 18

Discon, Inc. v. NYNEX Corp.,
    93 F.3d 1055 (2d Cir. 1996) .............................................................................17

Dist. 1199P Health & Welfare Plan v. Janssen, L.P.,
    784 F. Supp. 2d 508 (D.N.J. 2011) ........................................................................................14

Feiler v. N.J. Dental Assoc.,
    467 A.2d 276 (N.J. Super. Ct. Ch. Div. 1983)..........................................................................5

Fitzgerald v. Chrysler Corp.,
    116 F.3d 225 (7th Cir. 1997) ....................................................................................15, 16, 17

Fuchs Sugars & Syrups, Inc. v. Amstar Corp.,
    447 F. Supp. 867 (S.D.N.Y. 1978) ........................................................................................24

Grace v. E.J. Kozin Co.,
    538 F.2d 170 (7th Cir. 1976) .....................................................................................19, 20, 24

Harris v. Duty Free Shoppers Ltd. P'ship,
    940 F. 2d 1272 (9th Cir. 1991) ...............................................................................................22

Hemi Group, LLC v. City of New York,
    130 S. Ct. 983 (2010)....................................................................................................... passim

Ill. Brick Co. v. Illinois,
    431 U.S. 720 (1977)................................................................................................................22

In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.,
    No. 05-CV-01699, 2012 U.S. Dist. LEXIS 111446 (N.D. Cal. Aug. 2, 2012) ...........10, 13, 14

In re Lupron Mktg. & Sales Practices Litig.,
    295 F. Supp. 2d 148 (D. Mass 2003) .......................................................................................3

In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig.,
    No. 3:09-cv-20071, 2010 U.S. Dist. LEXIS 80758 (S.D. Ill. Aug. 5, 2010).....................13, 14

Ironworkers Local Union No. 68 v. AstraZeneca Pharms. LP,
    585 F. Supp. 2d 1339 (M.D. Fla. 2008)..................................................................................13

Jay E. Hayden Found. v. First Neighbor Bank, N.A.,
    610 F.3d 382 (7th Cir. 2010) .................................................................................................. 18

Kennedy v. Conn. Gen. Life Ins. Co.,
    924 F.2d 698 (7th Cir. 1991) ..............................................................................................4, 5

Kochert v. Greater Lafayette Health Servs., Inc.,
    463 F.3d 710 (7th Cir. 2006) ............................................................................................21, 22

Letsos v. Century 21-New West Realty,
    285 Ill. App. 3d 1056, 675 N.E. 2d 217 (Ill. App. Ct. 1997)....................................................23

Lupia v. Stella D'Oro Biscuit Co., Inc.,
   586 F.2d 1163 (7th Cir. 1978) ........................................................................................20, 24

Mantek Div. of NCH Corp. v. Share Corp.,
   780 F.2d 702 (7th Cir. 1986) ...................................................................................................25

McCree v. Grissom,
   657 F.3d 623 (7th Cir. 2011) ....................................................................................................2

Miyano Mach. U.S.A., Inc. v. Zonar,
   No. 92 C2385, 1993 U.S. Dist. LEXIS 963 (N.D. Ill. Jan. 29, 1993)......................................20

OSF Healthcare Sys. v. Banno,
   No. 08-1096, 2008 U.S. Dist. LEXIS 102726 (C.D. Ill. Sept. 24, 2008) ..................................5

Petri v. Gatlin,
   997 F.Supp. 956 (N.D. Ill. 1997) ..............................................................................................23

Quantum Grinding Corp., Inc. v. Supreme Screw Prods., Inc.,
   No. 03 C 0722, 2003 U.S. Dist. LEXIS 18787 (N. D. Ill. Oct. 20, 2003) ...............................21

Ransom v. A.B. Dick Co.,
   289 Ill. App. 3d 663, 682 N.E. 2d 314 (Ill. App. Ct. 1997)......................................................24

Richards v. Combined Ins. Co. of Am.,
   55 F.3d 247 (7th Cir. 1995) .......................................................................................................3

Richmond v. Nationwide Cassel L.P.,
   52 F.3d 640 (7th Cir. 1995) .....................................................................................................17

SmileCare Dental Grp. v. Delta Dental Plan,
   88 F.3d 780 (9th Cir. 1996) ...................................................................................................4, 5

Stachon v. United Consumers Club, Inc.,
   229 F.3d 673 (7th Cir. 2000) ...................................................................................................16

Tom v. Hawaii Dental Serv.,
   606 F. Supp. 584 (D. Haw. 1985)...............................................................................................5

Tricontinental Indus. v. PricewaterhouseCoopers, LLP,
   475 F.3d 824 (7th Cir. 2007) .....................................................................................................7

U.S. v. Lanas,
   324 F. 3d 894 (7th Cir. 2003) ..................................................................................................25

UFCW Local 1776 v. Eli Lilly & Co.,
   620 F.3d 121 (2d Cir. 2010)......................................................................................................10

<u>United Food & Commer. Workers Unions v. Walgreen Co.</u>,
No. 12 C 204, 2012 U.S. Dist. LEXIS 104315 (N.D. Ill. July 26, 2012) ...............................18

<u>United States v. Doherty</u>,
969 F.2d 425 (7th Cir. 1992) ....................................................................................................3

<u>United States v. Richman</u>,
944 F.2d 323 (7th Cir. 1991) ....................................................................................................3

<u>Wankel v. S. Ill. Bancorp, Inc.</u>,
No. 06-cv-0619, 2007 U.S. Dist. LEXIS 61138 (S.D. Ill. Aug. 21, 2007)...........................3, 8

<u>Williams v. Aztar Ind. Gaming Corp.</u>,
351 F.3d 294 (7th Cir. 2003) .................................................................................................3, 8

STATUTES

18 U.S.C. § 1347.........................................................................................................................4

18 U.S.C. § 1349.........................................................................................................................4

18 U.S.C. § 1962(c)........................................................................................................8, 15, 17, 18

18 U.S.C. § 1964(c)................................................................................................................8, 9

42 U.S.C. § 1395w-3(a)(c)(6)(B)................................................................................................5

Fed. R. Civ. P. 9(b) ....................................................................................................................6

Robinson-Patman Act § 2(c), 15 U.S.C. § 13(c) ................................................................. passim

Defendant Abbott Laboratories ("Abbott") submits this reply memorandum of law in support of its motion to dismiss the Complaint with prejudice.

## PRELIMINARY STATEMENT

The gist of this case, as plaintiff's memorandum makes clear, boils down to this – plaintiff is annoyed that patients, rather than insurers, receive a portion of the discounts that pharmaceutical manufacturers provide. Plaintiff's attempt to transmogrify this business dispute into RICO and antitrust claims fails. Whatever policies regarding "waiver of co-pays" that the federal government may have built into its healthcare programs, by statute or by regulation, they have no bearing here. Plaintiff is a private insurer, not a federal healthcare program. In addition, Abbott does not receive co-pays from patients or submit claims to third-party payors. Pharmacists do. Unlike pharmacists or medical providers, there is nothing for Abbott to "waive." As for Abbott's alleged duty to advise plaintiff when co-pay savings cards are used, plaintiff's memorandum (like plaintiff's complaint) cites to nothing in plaintiff's contracts with pharmacists or patients that bars the use of a co-pay savings card or that even imposes a duty on them – let alone Abbott – to disclose that a pharmacist is accepting, or a patient is using, a co-pay savings card to assist the patient in purchasing an Abbott product. Nor does plaintiff cite to any contract between Abbott and plaintiff (or any private insurer) that bars Abbott from offering patients co-pay assistance or requiring disclosure when such assistance is accepted.

Equally unavailing is plaintiff's attempt to link published pricing terms such as AWP or WAC to this case. Neither the calculation of AWP nor WAC is intended to reflect a patient's use of a co-pay savings card, because neither calculation is intended to reflect Abbott's net revenue after all discounts and rebates to purchasers, TPPs, or patients. WAC relates to the published list price wholesalers or retailers may pay. AWP is a mark up of WAC and is used (on occasion) by

TPPs as part of the formula for reimbursing pharmacists (e.g., TPP reimburses pharmacy at AWP minus 14%). The patient's use of a co-pay savings card has no bearing on either; just as discounts plaintiff receives in the form of rebates from pharmaceutical manufacturers have no bearing on calculating WAC and AWP.

Plaintiff similarly fails in its attempt to frame co-pay savings card programs as antitrust violations. Patients owe insurers no fiduciary obligation to purchase medicines for themselves based on plaintiff's budget. Nor do plaintiff's allegations show any harm to competition.

Any amendment would be futile. Plaintiff's recourse for its unhappiness with co-pay assistance programs is in the marketplace, not the courts. If plaintiff wants to require patients or pharmacists to disclose use of a co-pay savings card or to go so far as to prohibit patients from using co-pay savings cards, it is free to attempt to do so contractually – and face whatever commercial and public relation consequences may flow from that decision. The Court should dismiss the Complaint without leave to amend. See McCree v. Grissom, 657 F.3d 623, 624 (7th Cir. 2011).

## I.     PLAINTIFF'S RICO CLAIMS FAIL FOR AT LEAST FOUR REASONS

### A.     Plaintiff Fails to Identify Any Fraud

#### 1.     There is No Plausible Allegation of Fraud

Plaintiff fails to identify any contractual or common law duty on Abbott's part to determine which patients are insured by plaintiff and then inform plaintiff when these patients use co-pay savings cards in connection with filling prescriptions for Humira or AndroGel. Plaintiff even fails to identify the source of a duty on the part of a patient enrolled in a private insurance plan to forego using or accepting co-pay savings cards, or the basis of any duty on the part of a patient or pharmacist to disclose the use of co-pay savings cards. Nor does plaintiff explain, if patients and pharmacists do owe these duties, why they should be discharged by

Abbott.  See Abbott's Memorandum of Law in Support of Motion to Dismiss ("Abbott Br.") 12-15.

Plaintiff argues that it need not identify a duty because it alleges a scheme to defraud. See Plaintiff's Memorandum of Law in Opposition to Abbott's Motion to Dismiss ("Pl. Br.") at 29-31.  Plaintiff is wrong.  "Merely referencing 'mailings and telephone calls in furtherance of a purported scheme to defraud' will not suffice."  Wankel v. S. Ill. Bancorp, Inc., No. 06-cv-0619, 2007 U.S. Dist. LEXIS 61138, at *12 (S.D. Ill. Aug. 21, 2007).  "A necessary element of a scheme to defraud is the making of a false statement or material misrepresentation, or the concealment of a material fact."  Williams v. Aztar Ind. Gaming Corp., 351 F.3d 294, 299 (7th Cir. 2003).  None of plaintiff's cases holds to the contrary, and all involve either a duty or a misstatement.  See Richards v. Combined Ins. Co. of Am., 55 F.3d 247 (7th Cir. 1995) (finding no scheme to defraud despite defendant's contractual duty to refund unearned premiums); United States v. Richman, 944 F.2d 323 (7th Cir. 1991) (conspiracy to make an agent/employee lie to his principal/employer); United States v. Doherty, 969 F.2d 425 (7th Cir. 1992) (defendant kited checks); In re Lupron Mktg. & Sales Practices Litig., 295 F. Supp. 2d 148 (D. Mass 2003) (affirmative misstatement).

### 2. Plaintiff's "Waiver of Co-pay" Argument Fails

Plaintiff contends that when a healthcare provider declines to collect a co-pay and accepts whatever the insurer will pay without disclosing this declination, this "waiver of co-pay" is actionable under federal law and is comparable to Abbott providing co-pay assistance to patients. There are several problems with this theory.  First, there is a fundamental distinction between the healthcare provider in plaintiff's scenario and Abbott.  Abbott does not receive a co-pay from the patient.  Nor does it have an agreement with plaintiff to secure a co-pay from the patient.  Nor does Abbott file a claim with plaintiff (or any TPP) seeking reimbursement and represent in the

3

process that it collected a co-pay. Abbott sells the drug to a wholesaler, which in turn resells it to a pharmacy. As pled by plaintiff, the pharmacy is the entity that receives the co-pay and seeks reimbursement from plaintiff. See Compl. ¶ 23. Unlike plaintiff's "waiver of co-pay" scenario, the pharmacist does receive the amount of the co-pay called for by the patient's insurer. Plaintiff cites to nothing requiring that the pharmacist certify that the patient paid the co-pay without assistance from anyone.

Second, none of the federal statutes on which plaintiff relies even applies here. Plaintiff provides citations (Pl. Br. 8) to the federal anti-kickback statute, the False Claims Act, and the Civil Monetary Penalties Law, but these statutes address seeking reimbursement from the federal government. Plaintiff also argues that the "routine waiver of personal copay obligations constitutes financial inducements that are deemed illegal kickbacks and amounts to criminal health care fraud," citing 18 U.S.C. §§ 1347, 1349. Pl. Br. 8. This statute says nothing about waiver of co-pays or kickbacks, and plaintiff offers no reason why it would reach "routine waiver of personal copay obligations." Even if plaintiff did, the statute would not apply, because Abbott does not "waive[] any personal copay obligation" for the reasons discussed above.

Plaintiff's reliance on two cases involving "waiver" of co-pays is misplaced. Neither involves allegations that co-pay programs are fraudulent or illegal. Both cases simply affirm private insurers' ability to enforce express contractual provisions relating to certain types of co-pays. In Kennedy, the Seventh Circuit allowed insurer CIGNA, based on express contractual language, to decline to pay a chiropractor who had not collected a 20% co-pay from the insured patient. The court determined that CIGNA had a contractual right to refuse payment. See Kennedy v. Conn. Gen. Life Ins. Co., 924 F.2d 698 (7th Cir. 1991). In SmileCare, the Ninth Circuit held that it was not an antitrust violation for a dental insurer to refuse payment when a

4

co-pay was paid by a supplemental insurer instead of the insured. The insurer's contract required its insureds to pay their co-pays directly from their own funds instead of indirectly through premiums paid to a supplemental insurance provider. See SmileCare Dental Grp. v. Delta Dental Plan, 88 F.3d 780 (9th Cir. 1996).[1]

Plaintiff has not alleged that its contracts impose the obligations described in Kennedy and SmileCare. Nor has plaintiff alleged that its contracts with pharmacists require pharmacists to report the use of co-pay savings cards as a condition of reimbursement or prohibit pharmacists from accepting co-pay savings cards. Moreover, plaintiff has identified no legal obstacle to imposing these limitations on patients or pharmacists by contract.

To be sure, because of potential patient backlash, private insurers may be reluctant to bar patients from using co-pay savings cards. Plaintiff's hesitation to anger its customers, however, does not provide a basis for a RICO-based fraud claim against Abbott.

### 3.    WAC and AWP Are Irrelevant

Plaintiff argues that Abbott has somehow breached a duty to plaintiff, because "[f]ederal law holds drug manufacturers responsible for reporting accurate WAC and AWP prices." Pl. Br. 10. This assertion, for which plaintiff offers no citation, is irrelevant, because co-pay savings cards for patients have nothing to do with WAC or AWP.

WAC is defined by federal law as "the manufacturer's list price for the drug … to wholesalers or direct purchasers …" 42 U.S.C. § 1395w-3(a)(c)(6)(B). WAC concerns the list price paid by direct purchasers, or wholesalers; hence the name "wholesale acquisition cost." Id. Patients and third-party payors such as plaintiff are at most indirect purchasers. It would make

---

[1] Plaintiff's other citations (Pl. Br. nn. 29, 37) are all directed to the billing practices of medical providers. See Tom v. Hawaii Dental Serv., 606 F. Supp. 584, 585 (D. Haw. 1985); Feiler v. N.J. Dental Assoc., 467 A.2d 276, 281 (N.J. Super. Ct. Ch. Div. 1983); OSF Healthcare Sys. v. Banno, No. 08-1096, 2008 U.S. Dist. LEXIS 102726 (C.D. Ill. Sept. 24, 2008). Again, Abbott neither receives co-pays nor submits claims to TPPs.

little sense to take into account discounts to indirect purchasers in a price term relating to direct purchasers.[2]  See Abbott Br. 17-19.  Moreover, WAC expressly excludes "prompt pay or other discounts, rebates or reductions in price."  Id.  Co-pay assistance is simply a discount given to the patient.  It is no different from the discounts and rebates given to plaintiff and other third-party payors.  Plaintiff notably makes no argument that the discounts and rebates it may receive from Abbott or other manufacturers should be included in calculating WAC.

Plaintiff fares no better in regards to "AWP."  Plaintiff's reliance on allegations in other cases about AWP reporting is misplaced.  Pl. Br. 10-12.[3]  AWP is simply based on formulaic markups over WAC.  Pl. Br. 5 (citing Abbott Br. 17).  Therefore, discounts and rebates to patients and TPPs such as plaintiff are just as irrelevant to AWP as they are to WAC, because the former have no bearing on the price paid by the pharmacist to buy the drug and for which the pharmacist seeks reimbursement.

**B.      Plaintiff Fails to Plead Mail and Wire Fraud with the Requisite Particularity**

**1.      The Complaint's Lack of Particularity Has Little to Do with Plaintiff's Lack of Knowledge**

Plaintiff argues that the requirements of Rule 9(b) should be relaxed, because the information supporting its claims is "peculiarly within the defendant's knowledge or control."  Pl. Br. 13.  But much of what Rule 9(b) requires for this case are facts peculiarly within the plaintiff's knowledge or control.  For example:

- That plaintiff's contracts with patients require disclosure when a co-pay savings card is used.

---

[2] By way of example, a clothing manufacturer sells shirts to a department store but also sends coupons or rebate cards to potential consumers.  value of the coupon or rebate funded by the manufacturer has no bearing on the price paid by the department store.

[3] The Complaint does not allege that Abbott has reported AWP prices for any products, including AndroGel or Humira, since 2008.  According to plaintiff, Abbott's co-pay programs began in 2008.  See Compl. ¶¶ 65, 78.

- That plaintiff requires pharmacies to report whether a co-pay savings card is presented as a condition of reimbursement

- That plaintiff does not (or cannot) impose a prior authorization requirement on its members for AndroGel or Humira.

- What plaintiff would do if patients or pharmacists, or Abbott, disclosed when a co-pay savings card is used.

- Whether plaintiff negotiates any rebates or discounts with Abbott or whether a pharmacy benefits manager ("PBM") undertakes such negotiations for the plaintiff, and what benchmark prices, if any, plaintiff or its PBM rely on in such negotiations.

- What plaintiff or its PBM would do if Abbott reported benchmark prices in the way that plaintiff would prefer.

The absence of these particulars – to which plaintiff has unique access – speaks volumes about the merits of plaintiff's claim. Given the nature of plaintiff's claims, there are other particulars about Abbott's allegedly "open and notorious" programs (Compl. ¶ 56) that would be readily available to plaintiff. For example:

- What "instructions" to pharmacists Abbott puts on the back of its co-pay savings cards. (See Compl. ¶¶ 21, 22, 135).

- How co-pay savings cards affect physicians' prescribing decisions for Humira and AndroGel.

- What Abbott publishes about Abbott's prices to wholesalers, wholesalers' prices to pharmacies, or pharmacists' prices to patients.

- What representations Abbott makes about how co-pay subsidies are reflected (if at all) in the published benchmark prices for its drugs, be they prices published by Abbott or by third parties.

There is simply no justification for "relaxing" the burden that plaintiff has not met.

### 2. Plaintiff Must Plead Intent to Defraud

Plaintiff argues that it need not plead Abbott's intent. Plaintiff's own cases undermine that assertion. See Tricontinental Indus. v. PricewaterhouseCoopers, LLP, 475 F.3d 824, 842 (7th Cir. 2007) (reciting the pleading standard for securities fraud as including scienter). In any

event, plaintiff must meet the pleading standard for the mail and wire fraud alleged here. These require an allegation that the defendant "commission[ed] the act with intent to defraud." Williams v. Aztar Ind. Gaming Corp., 351 F.3d at 299 (7th Cir. 2003); see also Wankel v. S. Ill. Bancorp, Inc., 2007 U.S. Dist. LEXIS 61138, at *11 (S.D. Ill. Aug. 21, 2007).

Abbott does not dispute that intent can be inferred from a complaint's factual allegations. What is in dispute is the sufficiency of plaintiff's allegations. Plaintiff argues that intent can be inferred because allegedly Abbott is "not offering its drugs at a more competitive price." Pl. Br. 15. This allegation does not appear in the complaint, and the complaint contains no facts to support it. Nor does the complaint allege that Abbott's competitors do not have similar programs.

Plaintiff also argues that intent can be inferred because Abbott's co-pay programs do not help uninsured consumers. How this raises an inference of fraud is left unstated, and on its face plaintiff's logic is flawed in two respects. As an initial matter, uninsured patients do not pay co-pays. Therefore a co-pay program would not be helpful to uninsured patients. Plaintiff fails to allege (and in fact could not allege) that Abbott does not offer patient assistance programs to help uninsured patients. Second, plaintiff's proposition is that fraudulent intent should be inferred, because Abbott nets less when it purportedly commits fraud (by providing assistance to an insured patient) than when it allegedly does not assist an uninsured patient. This makes no sense.

### C.    Plaintiff Lacks RICO Standing

To state a civil RICO claim, a plaintiff must allege more than a RICO violation under 18 U.S.C. § 1962(c). A plaintiff must also allege that he was "injured in his business or property by reason of" a RICO violation to receive fees and treble damages. 18 U.S.C. § 1964(c). To have standing, therefore, a plaintiff must satisfy two burdens. First, the plaintiff must allege an injury

8

in its "business or property." And second, the plaintiff must allege that this injury is "by reason of" the RICO violation alleged. See Hemi Group, LLC v. City of New York, 130 S. Ct. 983, 988 ("Though framed as a single question, Hemi's petition for certiorari raises two distinct issues."). This latter requirement entails two further requirements. "[T]o state a claim under civil RICO, the plaintiff is required to show that a RICO predicate offense 'not only was a "but for" cause of his injury, but was the proximate cause as well.'" Id. at 989 (citation omitted). Plaintiff fails all three requirements. Plaintiff alleges no injury to its business or property, and any injury it might allege was not suffered "by reason of" any alleged RICO violation. Plaintiff cannot show that Abbott's alleged fraud – not disclosing when its co-pay savings cards are used – is either a "but for" cause or the proximate cause of any injury plaintiff might allege.

### 1.    Plaintiff Suffered No Injury to its "Business or Property"

To have standing under RICO, plaintiff must allege an injury to its "business or property." 18 U.S.C. § 1964(c). Plaintiff has not alleged any such injury for two reasons. First, plaintiff has not alleged that it did not or could not set its premiums in a way that accounts for any potential injury. See Abbott Br. 30-31. Second, plaintiff has not alleged that it paid for unsafe or ineffective medications. See Abbott Br. 31-32. Plaintiff argues that this case is somehow different from legions of RICO suits brought by TPPs involving alleged off-label drug marketing but fails to offer any reason why. See Pl. Br. 31. Indeed, plaintiff has not identified a single patient insured by plaintiff who used AndroGel or Humira when a cheaper therapeutic alternative would have resulted in the same patient outcome.

### 2.    Plaintiff Fails to Allege Reliance Sufficient for "But for" Causation

Plaintiff relies on the Supreme Court's decision in Bridge v. Phoenix Bond & Indem. Co. to argue that it need not plead first-person reliance. See Pl. Br. 17 (citing 553 U.S. 639 (2008)).

That is not the point. To show the requisite "but for" causation, plaintiff must offer a connection between Abbott's allegedly fraudulent statements or omissions and plaintiff's injury. As the Supreme Court observed in that case, "Of course, none of this is to say that a RICO plaintiff … can prevail without showing that <u>someone</u> relied on the defendant's misrepresentations…. In most cases, the plaintiff will not be able to establish even but-for causation if no one relied on the misrepresentation." <u>Bridge</u>, 553 U.S. at 658 (cited in Abbott Br. 23).

In off-label marketing drug cases involving RICO claims, courts have repeatedly applied <u>Bridge</u> to hold that the TPP must allege that somebody relied on the allegedly fraudulent statement. <u>See, e.g.</u>, <u>UFCW Local 1776 v. Eli Lilly & Co.</u>, 620 F.3d 121, 133 (2d Cir. 2010) (holding that reliance was a necessary part of the TPPs' causation theory); <u>In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.</u>, No. 05-CV-01699, 2012 U.S. Dist. LEXIS 111446, at *219 (N.D. Cal. Aug. 2, 2012) (collecting cases and noting that "Since <u>Bridge</u>, lower courts have consistently held that, in cases where TPPs allege injury in the form of payment for deceptively marketed pharmaceuticals, reliance on the part of some third party must be shown."); <u>see also</u> Abbott Br. 23-25.

In the present case, plaintiff has failed to identify anyone who allegedly relied on any misrepresentation or omission by Abbott precipitating plaintiff's purported injury. For example, plaintiff does not allege that, when it negotiated reimbursement rates with pharmacists, plaintiff assumed that the AWP or WAC for AndroGel somehow deducted the value of Abbott's co-pay savings card that some patients might use. Nor does plaintiff allege that, notwithstanding its knowledge of Abbott's highly-publicized co-pay savings card programs, plaintiff reasonably relied on Abbott's non-disclosure of card usage to conclude that cards were not being used by plaintiff's members.

Plaintiff offers no case supporting its theory that "but for" causation can be satisfied in the absence of plausible allegations of reliance by someone.

### 3.    There Are Too Many Links in Plaintiff's Causal Chain

Plaintiff argues in its memorandum that Abbott misreads the Supreme Court's precedents on the question of how to analyze proximate cause under RICO.  So too, according to plaintiff, have the Courts of Appeals for the Second, Third, Ninth and Eleventh Circuits, as well as at least eight district courts, including one in the Seventh Circuit.  See Abbott Br. 22-30.  Neither those courts nor Abbott have misread the Supreme Court's teachings, which require the dismissal of plaintiff's complaint.

Plaintiff argues that RICO does not require "direct factual causation" (Pl. Br. 17), a phrase that appears nowhere in Abbott's memorandum or in any of the Supreme Court precedents the parties have cited.  Whatever plaintiff means by the term "direct factual causation," there can be no doubt that a "'direct causal connection' between the predicate wrong and the harm" is required.  Hemi, 130 S. Ct. at 994 (quoting Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 460 (2006)).

The causal chain here is anything but direct.  Its indirect nature is clear when one assumes there is no "fraud" (the non-disclosure of the use of a co-pay savings card) and asks whether the harm alleged (the purchase of the Abbott drug as opposed to a less expensive but equally effective drug) would be remedied.  In the "no fraud" world, the following would occur:

1.    A physician prescribes AndroGel or Humira for a patient,

because the physician believes it is in the patient's best interest.

2.    The patient goes to her pharmacist and presents a co-pay

savings card.

11

3.  Either Abbott advises plaintiff the transaction is occurring (or
has occurred), or Abbott advises the patient or pharmacist that
she must tell the plaintiff that a co-pay savings card is being
used.

Elimination of plaintiff's alleged harm depends on multiple variables in the "no fraud" world.
First, the patient or pharmacist must follow Abbott's advice. Second, the plaintiff must have a
contractual right to require the patient to pay the co-pay without assistance (something not pled
here). Third, the plaintiff must be prepared to enforce that right. Fourth, the patient must decline
to pay the co-pay without assistance and ask her physician to prescribe another drug instead.
Fifth, the patient's physician must choose an alternative, less expensive medication that will
provide the same therapeutic benefit as Humira or AndroGel.

Plainly, disclosure of the patient's use of a co-pay savings card does not remedy
plaintiff's alleged "purchase" of too many prescriptions of AndroGel or Humira. There are too
many contingencies that are not affected by the elimination of the allegedly fraudulent conduct.

The disconnect between the alleged fraud and plaintiff's alleged harm here is even more
pronounced than in Hemi. In that case, the City of New York sued for tax revenues lost because
the defendant refused to file the reports that all out-of-state cigarette retailers must file with the
New York State tax collector. The City had an agreement with New York State to share the
information in these reports when disclosed, and defendant's failure to file them prevented the
City from pursuing this revenue. Hemi, 130 S. Ct. at 985.

There were two links in the causal chain in Hemi. The first was that the State would in
fact provide whatever information the defendant reported to the City. The second was that the
City would be able to use that information to collect taxes from those who had not paid them.

Because "the conduct directly causing the harm was distinct from the conduct giving rise to the fraud," the Court held that this was two links too many. See id.

Causation in the present case is far more remote than in Hemi. The plaintiff in Hemi articulated a causal connection between the defendant's non-disclosure and the City's right to collect taxes. Here, the plaintiff has not even stated what it would do if it learned a given patient was using a co-pay savings card. The "conduct directly causing the harm" — patients filling prescriptions for AndroGel or Humira when a cheaper medicine with the same therapeutic benefit is purportedly available — is "distinct from the conduct giving rise to the fraud" — Abbott's non-disclosure of the use of co-pay savings cards. Hemi, 130 S. Ct. at 985.

Plaintiff tries to deal with one of the multitude of intervening contingencies in this causal chain by arguing that physicians' decisions to prescribe Humira or AndroGel rather than a different drug are "in direct response to the RICO fraud." Pl. Br. 21. Plaintiff pleads no facts supporting this conclusory allegation. In the RICO off-label marketing cases, courts have repeatedly found that doctors' individual medical judgments are precisely the sort of independent contingencies that break the directness of TPPs' causal theories. See, e.g., In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig., 2012 U.S. Dist. LEXIS 111446, at *224 to *231 (N.D. Cal. Aug. 2, 2012); In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig., No. 3:09-cv-20071, 2010 U.S. Dist. LEXIS 80758, at *20 to *29 (S.D. Ill. Aug. 5, 2010) ("In re Yasmin"); Ironworkers Local Union No. 68 v. AstraZeneca Pharms. LP, 585 F. Supp. 2d 1339, 1344 (M.D. Fla. 2008).

Nor is this the only defect. Plaintiff does not, and cannot, make the same statement made in Bridge that "there are no independent factors that account for [plaintiff's] injury." Bridge, 533 U.S. at 658. To do so, plaintiff would have to argue – but does not – that patients, physicians,

and pharmacists make their decisions because Abbott does not disclose to plaintiff when a

co-pay savings card is used.  See Dist. 1199P Health & Welfare Plan v. Janssen, L.P., 784 F.

Supp. 2d 508, 523 (D.N.J. 2011) ("In other words, the proximate cause requirement ensures that

… there are no independent variables that could account for a plaintiff's injuries."); In re Yasmin,

2010 U.S. Dist. LEXIS 80758, at *20 to *22 (S.D. Ill. Aug. 5, 2010) (collecting cases examining

the various independent factors involved in TPP cases); cf. Anza, 547 U.S. at 459 ("Businesses

lose and gain customers for many reasons, and it would require a complex assessment to

establish what portion of Ideal's lost sales were the product of National's decreased prices.").

### 4.      Foreseeability By Itself is Not Sufficient

Plaintiff seizes upon language in Bridge to argue that causation is "sufficiently direct to

permit recovery … so long as the plaintiff's injury was 'a foreseeable and natural consequence of'

the defendant's misconduct."  Pl. Br. 17.  Hemi rejects this view.  See Hemi, 130 S. Ct. at 991

("The dissent would have RICO's proximate cause requirement turn on foreseeability, rather than

on the existence of a sufficiently 'direct relationship' between the fraud and the harm."); see also

In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig., 2012 U.S. Dist. LEXIS

111446, at *225 (N.D. Cal. Aug. 2, 2012) (rejecting the argument that foreseeability is sufficient

"because it directly contradicts the relevant Supreme Court precedent.").  Plaintiff's argument

about foreseeability in reliance on Bridge ignores the Court's observation that, "unlike in Holmes

and Anza, there are no independent factors that account for respondents' injury."  Bridge, 553

U.S. at 658.  The same cannot be said here.

Nor does the Seventh Circuit's decision in BCS Services, Inc. v. Heartwood 88, LLC, 637

F.3d 750 (7th Cir. 2011), alter the causation analysis.  Although plaintiff's memorandum

discusses the BCS decision at some length, it does not address the distinctions drawn in Abbott's

opening memorandum.  See Abbott Br. 28-30.

14

### D.      Plaintiff Fails to Plead a RICO Enterprise

The Complaint fails to allege any involvement by co-pay administrators in plaintiff's WAC/AWP theory of fraud, so there is no "enterprise" for Abbott to conduct or participate in with regard to that theory.  And the administrators' role in plaintiff's non-disclosure theory of fraud does not constitute a RICO "enterprise."  Plaintiff's reliance on Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158 (2001), and Boyle v. United States, 556 U.S. 938 (2009) is misplaced and conflates two different issues ("distinctness" and "common purpose") – each of which bears on whether plaintiff has pled a viable RICO claim.

### 1.      The Alleged Enterprise's Affairs Are Not Distinct from Normal Business Affairs

The first issue is whether the enterprise's affairs are sufficiently distinct from the normal business affairs of the "person" that "conduct[s] or participate[s] … in the conduct of [the] enterprise's affairs through a patten of racketeering activity."  18 U.S.C. § 1962(c).  In Cedric Kushner, the Supreme Court affirmed the principle that RICO liability "depends on showing that the defendants conducted or participated in the conduct  of the 'enterprise's affairs,' not just their own affairs."  556 U.S. at 163 (quoting Reves v. Ernst & Young, 507 U.S. 170, 185 (1993).  In that case, the defendant was not just conducting his "own affairs."

Plaintiff relies on Cedric Kushner to argue that the distinctness requirement is satisfied so long as the enterprise simply consists of the RICO person (Abbott) and a distinct legal entity (the administrators).  This overstates the holding in Cedric Kushner, which does not weaken longstanding Seventh Circuit precedent.  That Seventh Circuit precedent consistently requires that an "enterprise" be more than a course of conduct perpetrated by a defendant through the use of a defendant's agents.  See Fitzgerald v. Chrysler Corp., 116 F.3d 225, 228 (7th Cir. 1997); see also Brittingham v. Mobil Corp., 943 F.2d 297, 303 (3d Cir. 1991) (cited in Abbott Br. 22, n.9)

(holding that an enterprise was not sufficiently distinct where advertising agencies "were defendants' agents, and did no more than conduct the normal affairs of the defendant corporations").

Plaintiff does not allege in its complaint anything other than Abbott's having dealt with third-party administrators in the "ordinary way." Fitzgerald, 116 F.3d at 228. Plaintiff "must present something more than generalized assertions of conspiracy; otherwise, 'every conspiracy to commit fraud that requires more than one person to commit is a RICO organization and consequently every fraud that requires more than one person to commit is a RICO violation.'" Stachon v. United Consumers Club, Inc., 229 F.3d 673, 676 (7th Cir. 2000) (citation omitted).

At bottom, plaintiff's allegations describe nothing more than "the ordinary operation of a garden-variety" services arrangement between Abbott and its co-pay program administrators. Fitzgerald, 116 F.3d at 228. "A RICO enterprise is more than a combination of persons who commit alleged predicate acts of racketeering; there must be an organization with a structure and goals separate from the predicate acts themselves." Crichton v. Golden Rule Ins. Co., 576 F.3d 392, 400 (7th Cir. 2009) (citations and internal quotation marks omitted). What plaintiff has alleged is a fraud "perpetrated by" Abbott, "not an association-in-fact enterprise directed and controlled by" Abbott. Id.

Plaintiff argues that the facts here are similar to those in Beiersdorf, Inc. v. International Outsourcing Services, LLC, a case involving RICO claims against corporate defendant IOS and several individual defendants who had already been indicted for engaging in a fraudulent scheme. See Pl. Br. 26-27 (citing No, 07-C-888, 2008 U.S. Dist. LEXIS 36689 (E.D. Wis. Apr. 30, 2008)). In the normal course, "IOS receives cents-off coupons from retail stores where the coupons have been (or should have been) redeemed by customers." Beiersdorf, 2008 U.S. Dist.

LEXIS 36689, at *7. The fraudulent scheme involved defendants' "specifically ask[ing] for non-redeemed coupons from the coupon brokers so it could fraudulently submit them for reimbursement." Id. at *12. Therefore, the affairs of the enterprise (IOS plus the individuals) – to seek non-redeemed coupons from brokers in order to fraudulently seek reimbursement – was sufficiently distinct from the ordinary business affairs of each participant.

The present case is like Fitzgerald and not like Beiersdorf. Like Chrysler's dealers in Fitzgerald, and unlike the corporate defendant in Beiersdorf, the third-party administrators here are "merely a conduit" and neither Abbott lends them nor do they lend Abbott "an air of legitimacy." Fitzgerald, 116 F.3d at 227. Plaintiff argues (Pl. Br. 26-27) that Abbott relies on the administrators' "technical skills" to accomplish its alleged fraud but offers no cases for the proposition that using the know-how of an agent constitutes an exception to the general rule that RICO should not apply to "a free-standing corporation" such as Abbott "merely because [it] does business through its agents, as virtually every manufacturer does." Fitzgerald, 116 F.3d at 227. [4]

## 2. Plaintiff Has Not Adequately Pled a "Common Purpose"

The issue plaintiff conflates with "distinctness" is the requirement that RICO enterprises consist of persons associated together for a common purpose. In Boyle, the Supreme Court held that an association-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct" and let stand a conviction based on jury instructions that erroneously indicated an enterprise need not have a structure. 556 U.S. at 946 (quoting

---

[4] Plaintiff's other criticisms of Abbott's cases miss the mark. Contrary to plaintiff's assertion (Pl. Br. 28), Bachman v. Bear, Stearns & Co. is a case concerning the enterprise requirement of § 1962(c). See 178 F.3d 930, 931 (7th Cir. 1999); see also id. at 932 ("If Snyder, Ferrell, and Company are a RICO organization, then every conspiracy to commit fraud is a RICO organization and consequently every fraud that requires more than one person to commit is a RICO violation. That is not the law.") Abbott does not cite Richmond v. Nationwide Cassel L.P. 52 F.3d 640 (7th Cir. 1995), for the grounds on which plaintiff seeks to distinguish it. Compare Abbott Br. 21 with Pl. Br. 28. Nor does Abbott cite Discon, Inc. v. NYNEX Corp., 93 F.3d 1055 (2d Cir. 1996), for the proposition for which plaintiff attacks it. Compare Abbott Br. 21 with Pl. Br. 28.

United States v. Turkette, 452 U.S. 576, 583 (1981)).  Plaintiff relies on Boyle to argue that the enterprise requirement is met, because Abbott and its administrators "share a common purpose of defrauding TPPs"  Pl. Br. 25; id. at 24-28.

Plaintiff's assertion in its memorandum that Abbott and its administrators "share a common purpose of defrauding TPPs by disguising the co-pay subsidies in order to evade the class's drug coverage restrictions and overcharge payors" is not sufficient.  Pl. Br. 25.  The Complaint alleges nothing to support the claim that either Abbott or its administrators have this purpose.  Indeed, the Complaint alleges the opposite.  See Compl. ¶ 61 ("Defendant designed and implemented the programs…"); id. at ¶ 89 ("defendant hired [the administrators] to administer its co-pay subsidy programs.").[5]

\*     \*     \*

For all of these reasons, plaintiff's RICO claims should be dismissed.  The infirmities in plaintiff's claims cannot be addressed by amendment, and the dismissal should be with prejudice.

## II.    PLAINTIFF'S ROBINSON-PATMAN ACT CLAIMS SHOULD BE DISMISSED

Plaintiff's memorandum fails to overcome any of the four independent grounds for dismissing its antitrust claims – any one of which is a sufficient basis to dismiss those claims with prejudice.

---

[5] Even if plaintiff did make some adequate allegation of a common purpose between Abbott and its administrators, the common purpose requirement of Boyle and the distinctness requirement of Section 1962(c) are separate inquiries.  See Jay E. Hayden Found. v. First Neighbor Bank, N.A., 610 F.3d 382, 389 (7th Cir. 2010); see also Crichton v. Golden Rule Ins. Co., 576 F.3d 392, 400 (7th Cir. 2009); United Food & Commer. Workers Unions v. Walgreen Co., No. 12 C 204, 2012 U.S. Dist. LEXIS 104315, at \*12 to \*15 (N.D. Ill. July 26, 2012).  It would be futile to allow an amendment to allege a common purpose when the plaintiff cannot meet the distinctness requirement of a RICO claim.

### A.  Plaintiff Does Not Have an Antitrust Injury

It cannot be disputed that an antitrust injury must be "[1] of the type the antitrust laws were intended to prevent" and "[2] reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977). What is lacking in the present case are factual allegations making it plausible that plaintiff is being harmed in a manner that interferes with its ability to compete.

Plaintiff alleges that it reimburses (or pays more) for more Abbott medicines than it would in the absence of the co-pay savings card programs, because absent the co-pay savings cards, physicians would prescribe less expensive drugs (with the same patient outcome). Pl. Br. 34. If true, this is true of all TPPs and not just plaintiff, because, according to the Complaint, all patients across all TPPs are using co-pay savings cards. See Pl. Br. 34-35 (conceding that "the TPPS pay higher prices" and "higher prices end up being paid by all"). Therefore, plaintiff is not at a competitive disadvantage versus other TPPs.

In the absence of a plausible allegation of direct or indirect price discrimination between plaintiff and its competitors as a consequence of Abbott's alleged bribery of plaintiff's members, plaintiff's allegation of "pay[ing] more for the product than it otherwise would have" (Pl. Br. 36) is insufficient. See, e.g., 2660 Woodley Road Joint Venture v. ITT Sheraton Corp., 369 F.3d 732, 738-39 (3d Cir. 2004) (Even when an injury is caused by breach of a contract and corruption of a principal-agent relationship, the injury is not a Section 2(c) antitrust injury if it involves no more than "paying inflated purchasing prices to vendors.").

Contrary to plaintiff's assertion (Pl. Br. 38 n.197), the Seventh Circuit did not create an "expansive" antitrust injury standard in Grace v. E.J. Kozin Co., 538 F.2d 170 (7th Cir. 1976) for Section 2(c) plaintiffs. The Grace court applied Section 2(c) to a commercial bribery case in

order "to protect the integrity of the principal-agent relationship where a violation has an anti-competitive effect." Grace, 538 F.2d at 173 (emphasis added). There was an anticompetitive effect "cognizable under the antitrust laws," because defendant's bribes of plaintiff's employee caused plaintiff to pay higher prices than its competitors. Id. at 173-74. In the Seventh Circuit's words, the "net effect of [defendant's] bribery [of plaintiff's employee] was indirect price discrimination." Id. at 174.

The Seventh Circuit has never wavered from interpreting Section 2(c) as prohibiting price discrimination. See Lupia v. Stella D'Oro Biscuit Co., Inc., 586 F.2d 1163, 1169 (7th Cir. 1978). The district courts in the Seventh Circuit have not wavered either. Plaintiff contends that this Court "expressly disclaimed the necessity of alleging price discrimination" in Section 2(c) cases (Pl. Br. 37), but in Miyano Mach. this Court wrote: "Several courts [outside the Seventh Circuit] have expressly stated that the anticompetitive effect need not be in the form of price discrimination even though that is the primary thrust of § 2. … But see Grace, 538 F.2d 170 (indirect price discrimination found in higher prices charged because of bribe to buyer's agent)." Miyano Mach. U.S.A., Inc. v. Zonar, No. 92 C2385, 1993 U.S. Dist. LEXIS 963, at *26 n.7 (N.D. Ill. Jan. 29, 1993). Plaintiff's quotation of footnote 7 from Miyano Mach. (Pl. Br. 37 n.194) omits the portion of the footnote that begins "But see Grace."[6]

Plaintiff's other citation from this Court (Pl. Br. 34) confirms that a Section 2(c) antitrust injury requires the existence of bribes that "force competitors to buy more expensive goods" and to buy them "at higher prices than the defendant [plaintiff's competitor] because of the bribes."

---

[6] Plaintiff's critique of this Court's decision in Bunker Ramo (Pl. Br. 38, n.197) is that this Court purportedly "ignored" Grace (at least as misread by plaintiff) when this Court wrote that a plaintiff "must allege some competitive injury of the type which the Robinson-Patman Act was designed to protect against," that Section 2(c) is "designed to protect and promote competition among businesses competing at the same functional level" and that the "key factor" in Grace was that plaintiff and defendant were competitors paying different prices to common suppliers. Bunker Ramo Corp. v. Cywan, 511 F. Supp. 531, 533 & 534, n.3 (N.D. Ill. 1981).

Quantum Grinding Corp., Inc. v. Supreme Screw Prods., Inc., No. 03 C 0722, 2003 U.S. Dist. LEXIS 18787, *7 (N. D. Ill. Oct. 20, 2003) (emphasis added).

Plaintiff's other arguments about purported effects on competition do not involve price discrimination between plaintiff and its competitors -- and do not even describe anticompetitive effects. Plaintiff argues that Abbott's co-pay savings card programs "diminish" the ability of all TPPs to "threaten" Abbott with adverse tier placement of Abbott's medicines and that the programs eliminate all TPPs "ability to compete on benefit plan design." Pl. Br. 35. However, the complaint contains no factual allegations to support this argument and plaintiff's memo similarly is silent.

### B. Plaintiff Does Not Have Antitrust Standing

Plaintiff's argument (Pl. Br. 38) that it satisfies the "causal connection" and "directness" factors for antitrust standing ignores an undisputed fact (recognized in the cases cited at pp. 13-14 above). Physicians make the decisions to prescribe Abbott's medicines rather than to prescribe allegedly less expensive therapeutic alternatives. As discussed on pp. 13-14, the independent prescribing decisions of physicians mean that Abbott's co-pay savings card programs are remote from the cause of plaintiff's purported injury.

Plaintiff also expressly identifies more appropriate litigants than itself when it asserts in its memorandum that "[c]opay subsides squelched competition with less expensive alternatives." Pl. Br. 37. If there are any less expensive alternatives to Abbott's medicines, the manufacturers of the "squelched" competitive products are in a better position than plaintiff to bring suit – assuming such conduct was actionable. [7]

---

[7] Plaintiff cites Kochert v. Greater Lafayette Health Servs., Inc., 463 F.3d 710 (7th Cir. 2006) for an example of an insurer plaintiff as an "efficient claimant" (Pl. Br. 38, n.203), but the court merely concluded that an insurer was a "more efficient claimant" in comparison to an individual physician challenging a hospital's exclusive dealing with

To the extent plaintiff argues that it is a "consumer" and has standing as a "consumer" (Pl. Br. 39 n.204), it is wrong. Plaintiff does not purchase medicines directly from Abbott. As an indirect purchaser at best, plaintiff does not have standing under the <u>Illinois Brick</u> doctrine. <u>See</u> <u>Ill. Brick Co. v. Illinois</u>, 431 U.S. 720, 735 (1977).

### C. Plaintiff Has Failed to State a Claim Under Section 2(c)

Plaintiff's allegations fail to state a claim under Section 2(c) for two independent reasons. First, plaintiff cannot allege that its members are its agents, representatives or intermediaries within the meaning of Section 2(c). There is no decision by the Seventh Circuit (or by a court in the Seventh Circuit[8] supporting plaintiff's argument that the only requirement for a Section 2(c) claim is an allegation that an alleged bribe "cross[es] the buyer-seller line" and that "it is immaterial whether Carpenters pleads a fiduciary relationship" between plaintiff and patients. Pl. Br. 40-41). Second, there is nothing secretive about Abbott's highly publicized co-pay savings cards.

Turning to the first point, plaintiff asserts that a contract "<u>can</u> create an agency relationship" (Pl. Br. 42 (emphasis added)), but does not supplement its deficient complaint with a copy of its contracts with its members (or even a description of the contracts). The assertion that the members "bind Carpenters to remit payment for the drugs they choose and are, in effect, Carpenter's purchasing agents" (Pl. Br. 42-43) is both unsupported and insufficient. Patients filling prescriptions are not acting on behalf of plaintiff but rather acting in their own interest in utilizing the insurance benefits the patients or their employer have paid for.

---

a physician group. <u>Kochert</u>, 463 F.2d at 713 and 718. Here, plaintiff falls short when compared to the manufacturers of any allegedly less expensive alternatives.

[8] The fiduciary requirement for Section 2(c) is not novel to the Seventh Circuit. <u>See, e.g.</u>, <u>2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp.</u>, 369 F. 3d 732, 737 n.4 (3d Cir. 2004) ("As a general principle, a critical element of commercial bribery is the breach of a duty of fidelity."); <u>Harris v. Duty Free Shoppers Ltd. P'ship</u>, 940 F. 2d 1272, 1274 n.3 (9th Cir. 1991) (Section 2(c) "can be read to prohibit commercial bribery where a fiduciary relationship exists.").

An alleged agent must consent to act on behalf of an alleged principal and "be subject to the principal's control." Clarendon Nat'l Ins. Co. v. Medina, 645 F.3d 928, 935 (7th Cir. 2010) (following Restatement (Third) of Agency). In Petri v. Gatlin, 997 F.Supp. 956 (N.D. Ill. 1997) (cited at Pl. Br. 42-43), the contract was entitled "Agency Agreement" and recited the alleged agent's specific responsibilities to the alleged principal. Certain responsibilities "fit the standard definition of an agency relationship" because the principal delegated the transaction of the principal's lawful business to the agent. With regard to those responsibilities, there was an agency relationship and fiduciary duties were implied as a matter of law. Id. at 978-79. Other responsibilities – neither the alleged agent's promise to supply the alleged principal's monthly natural gas requirements nor the promise to charge a price not greater than the price charged by a third party – created an agency relationship. Id. at 979 n.17. It is hardly sufficient that a contract merely imposes obligations on a person. Instead, the contract must involve delegation of the principal's affairs and the agent's assent to conduct the principal's affairs.[9]

Nor are insureds "representatives" within the meaning of Section 2(c). Allegations that plaintiff's purported "buying" obligations are "dictated by the purchasing decisions" of the members and that the members operate under purported "constraints imposed by Carpenters's insurance agreements" (Pl. Br. 41) do not turn plaintiff's members into plaintiff's "representatives" for purposes of Section 2(c). Plaintiff turns the world upside down so that insurance benefits sold by the insurer and purchased by the insured (or his employer) for the insured's own benefit somehow makes insureds the "representatives" of the seller of such services. When a TPP insures its member, that member does not step into a "special" relationship consisting of the TPP's trust and a status of superiority or control over the TPP.

---

[9]  Plaintiff's other case citation with regard to creation of agency by contract (Letsos v. Century 21-New West Realty, 285 Ill. App. 3d 1056, 675 N.E. 2d 217 (Ill. App. Ct. 1997) deals with a relationship after the termination of a contract and is irrelevant to plaintiff's argument.

Ransom v. A.B. Dick Co., 289 Ill. App. 3d 663, 672, 682 N.E. 2d 314, 321 (Ill. App. Ct. 1997). In the absence of such special circumstances, there is no relationship of the type the Seventh Circuit protected in Grace.

Nor are insureds "intermediaries" within the meaning of Section 2(c). Plaintiff ignores the explanation in Fuchs Sugars & Syrups, Inc. v. Amstar Corp., 447 F. Supp. 867, 879-80 (S.D.N.Y. 1978), rev'd on other gds, 602 F.2d 1025 (2d Cir. 1979), that a person meets Section 2(c)'s express requirement of "acting in fact for or in behalf" of a party when they act "primarily for the benefit of [the party] … rather than primarily for their own benefit." Plaintiff cannot allege that its members purchase Abbott's medicines primarily for the benefit of plaintiff. Nor can plaintiff argue that it meets Section 2(c)'s express requirement of "direct or indirect control" over its members when they purchase Abbott's medicines.

Plaintiff therefore has not -- and cannot -- allege any of the three relationships set forth in Section 2(c) or allege facts that create a fiduciary duty running from plaintiff's members to plaintiff.

### D.    Abbott's Co-pay Programs Are Not a Secret

Plaintiff also fails to state a Section 2(c) claim for a separate and independent reason: Plaintiff cannot allege that the allegedly "open and notorious" co-pay savings card programs are secret compensation. In an attempt to overcome that defect, plaintiff argues implausibly (Pl. Br. 44) that there might be a secrecy requirement in the Seventh Circuit in Section 2(c) cases for discounts in lieu of brokerage (Lupia v. Stella D'Oro Biscuit Co., Inc., 586 F. 2d 1163, 1170 (7th Cir. 1978)) but that there should not be a requirement when a Section 2(c) case involves alleged corruption of an agent, representative or intermediary of the complaining party. If there were any reason to treat brokerage discounts one way and bribes another, the Section 2(c) bribery cases would be the stronger candidates for the secrecy requirement. Commercial bribery is

understood by the Seventh Circuit to involve "secretly giving a bribe to the customer's agent to induce the agent to betray his principal (the customer)." Mantek Div. of NCH Corp. v. Share Corp., 780 F.2d 702, 705 n.3 (7th Cir. 1986) (recognizing a commercial-bribery defense to a breach of contract action). See also U.S. v. Lanas, 324 F. 3d 894, 904-05 (7th Cir. 2003) (criminal mail fraud).

Plaintiff argues in the alternative that partial concealment satisfies the secrecy requirement and that, even though plaintiff knows about Abbott's programs, plaintiff does not know "when" its members use co-pay savings cards. Pl. Br. 44-45 & n.242. No case is cited in support of this proposition. Nor does it make much sense. Under plaintiff's theory, plaintiff is aware that its agents are corrupt and accepting bribes and "betray[ing their] principal," but the principal's failure to learn the details somehow renders the bribe a "secret."

Plaintiff's Section 2(c) claims should be dismissed with prejudice on any one (or on all) of the four foregoing grounds.

## **CONCLUSION**

Plaintiff's complaint should be dismissed with prejudice for the reasons set forth in Abbott's opening and reply memoranda of law.

Dated: New York, New York
November 21, 2012

Respectfully submitted,

ABBOTT LABORATORIES

_/s/   William F. Cavanaugh, Jr._
William F. Cavanaugh, Jr.
Thomas W. Pippert
Scott Caplan
Ashley Ochs
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036
Tel. (212) 336-2000
Fax (212) 336-2222

Samantha L. Maxfield
Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601
Tel. (312) 558-5600
Fax (312) 558-5700

*Counsel for Defendant*
*Abbott Laboratories*

## CERTIFICATE OF SERVICE

I hereby certify that on November 21, 2012, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system which will send notification of such filing to the

following persons at the given e-mail addresses:

Kenneth A. Wexler
Bethany R. Turke
Amy E. Keller
Dawn M. Goulet
WEXLER WALLACE LLP
55 West Monroe Street
Suite 3300
Chicago, IL 60603
Tel: (312) 346-2222
Fax: (312) 346-0022
kaw@wexlerwallace.com
brt@wexlerwallace.com
aek@wexlerwallace.com
dmg@wexlerwallace.com

Thomas M. Sobol
Kristen Johnson Parker
Lauren Guth Barnes
Hagens Berman Sobol Shapiro LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
Tel: (617) 482-3700
Fax: (617) 482-3003
tom@hbsslaw.com
kristenjp@hbsslaw.com
lauren@hbsslaw.com

On the same date, I caused a true and correct copy of the foregoing motion to be

sent to the following individuals via U.S. Mail:

Steve W. Berman
Barbara A. Mahoney
Hagens Berman Sobol Shapiro LLP
1918 Eighth Ave., Suite 3300
Seattle, WA 98101

/s/ William F. Cavanaugh, Jr. _____