# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH AND WELFARE FUND, individually and on behalf of all others similarly situated, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No. 12 CV 1662 ) ) Judge Robert M. Dow, Jr. |
| ABBOTT LABORATORIES and ABBVIE, INC., | ) ) ) |
| Defendants. | ) ) ) |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendants Abbott Laboratories and AbbVie, Inc.'s ("Defendants") motion to dismiss [124] Plaintiff's first amended complaint. Defendants manufacture and market two brand name drugs, Humira and AndroGel. Humira treats rheumatoid arthritis and plaque psoriasis, and AndroGel is a replacement therapy for men with low testosterone levels. In 2008, Defendants began offering savings cards or coupons that discount patients' co-pay obligations for the drugs. These savings card programs—or co-pay subsidy programs, as Plaintiff terms them—seek to increase the sales of Humira and AndroGel by encouraging patients to choose Defendants' brand name drugs over less costly generic medications.

Plaintiff provides health benefits to its insureds and seeks to recover damages resulting from Defendants' co-pay subsidy programs. Defendants' alleged malfeasance falls into two categories. First, Plaintiff contends that the co-pay subsidies frustrate pharmacies' contractual obligation to collect co-pays directly from Plaintiff's insureds. Second, Defendants allegedly

instruct pharmacies to conceal the use of their co-pay subsidies from Plaintiff by instructing pharmacies to process the subsidies as if they were a form of secondary insurance. Plaintiff alleges violations of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d), and tortious interference with contract. Defendants move to dismiss the amended complaint in its entirely. For the reasons that follow, the Court grants Defendants' motion as to Plaintiff's RICO claims (counts one through four). The Court will not issue a ruling at this time on the motion as it relates to the tortious interference with contract claims (counts five and six), as it is unclear whether the Court has an independent basis for asserting jurisdiction over those claims. The case is set for status hearing on 10/7/2014 at 9:30 a.m.

I. **Factual Background**[1]

Plaintiff, New England Carpenters Health and Welfare Fund, is a Massachusetts-based employee welfare benefit plan that provides health benefits to 22,000 eligible beneficiaries throughout New England. It seeks to represent similarly situated third-party payors ("TPPs") that have allegedly spent additional funds on AndroGel and Humira due to Defendants' co-pay subsidy programs. First, Plaintiff contends that the co-pay subsidies have increased the popularity of AndroGel and Humira, causing more of its insureds to fill prescriptions for these brand name drugs, when they would otherwise choose significantly cheaper generic alternatives. See Am. Compl. ¶ 21. Additionally, Plaintiff maintains that it is overcharged for each drug that is purchased with a co-pay subsidy; Plaintiff is made to reimburse the pharmacy for the cost of the drug *as if* the drug were being sold at full price, rather than a discounted price that would result if the co-pay subsidy were processed as a regular coupon (instead of as secondary

---

[1] The facts are drawn from Plaintiff's amended complaint. For purposes of Defendants' motion to dismiss, the Court assumes as true all well-pleaded allegations set forth therein. See *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

insurance). See *id.* at ¶¶ 21, 29.

## A. Plaintiff's Efforts to Impose Cost-Sharing on Its Insureds

Plaintiff's alleged harm stems in large part from Defendants' reduction or removal of co-pays that would otherwise make insureds sensitive to price differences among prescription drugs. Because TPPs cover the majority of the cost of prescription drugs, they require their insureds to share part of the cost (here in the form of co-pays) to incentivize insureds to opt for less costly medications. TPPs accordingly impose higher co-pays for more expensive brand name drugs than they do for cheaper generics. Plaintiff explains:

> "Cost-sharing provisions in prescription drug benefit plans unite the financial interests of the health insurer with the interests of its beneficiaries. Requiring health plan members to pay a portion of the high cost of a branded prescription drug—either a co-pay or co-insurance—provides a reasonable, personal incentive for privately-insured individuals to choose less-costly, usually generic, medications, and drives down the cost of the much larger residual portion paid by the TPPs. Absent such incentives, patients have no financial motivation to select lower-cost drugs.

Am. Compl. at ¶ 2.

To implement cost-sharing provisions, pharmacies are contractually obligated to collect the TPP's designated co-pay *directly from the patient* when a prescription is filled. Specifically, TPPs hire pharmacy benefit managers to manage and administer their prescription drug benefits, including cost-sharing provisions. *Id.* at ¶ 49. Pharmacy benefit managers, acting on behalf of TPPs, contract with pharmacies to establish retail pharmacy networks that provide prescription drugs to TPP's insureds. *Id.* Pursuant to these contracts (referred to as pharmacy network agreements), pharmacies must abide by the terms of the TPP's health benefit plan. *Id.* at ¶ 50. Pharmacy manuals, which supplement the pharmacy network agreements, also are binding and contain terms regarding the collection of co-pays. For example, one such manual, used by Medco Health Solutions, Inc. ("Medco"), Plaintiff's pharmacy benefit manager, states that the

pharmacy "acknowledges that the co-payment/coinsurance or other direct payment is an integral part of the plan design selected by the Sponsor [(the TPP)], and Provider [(the pharmacy)] will not waive or discount the applicable co-payment/coinsurance or other direct payment under any circumstances." *Id.* at ¶ 52 (quoting Medco Pharmacy Services Manual (2011), at 39). The Medco Manual further explains that the co-pay is to be paid directly by the insured. *Id.* at ¶ 53 (quoting Medical Pharmacy Services Manual (2011), at 10). Pharmacy benefit managers typically use standard form contracts that include the same material terms with respect to co-pays. Such agreements and manuals are ubiquitous in the pharmacy industry and often available online. *Id.* at ¶ 54.

### B. Defendants' Co-Pay Subsidy Programs

With this background in mind, Defendants began offering co-pay subsidies for AndroGel and Humira to compete with less expensive generic drugs. Defendants retained two companies, TrialCard, Inc. and Pharmacy Data Management, Inc. ("PDMI") to administer an AndroGel savings card, which pays $20 of a patient's monthly co-pay for up to twelve times. Am. Compl. ¶ 72. Similarly for Humira, Defendants retained Opus Health to administer the Humira Protection Plan, which reduces patients' co-pays to as low as $5 per month. *Id.* at ¶ 83. TrialCard, PDMI, and Opus Health are collectively referred to as Defendants' co-pay subsidy administrators.

Patients register for Defendants' savings cards online and use them at pharmacies to discount their co-pays when they fill prescriptions for Humira and AndroGel. The pharmacist first processes the patient's insurance coverage by entering the patient's health insurance information into an electronic "primary insurance" field. *Id.* at ¶ 58. Per Defendants' instructions and the design of the savings card, there is no indication that a discount will be

4

applied. The electronic "secondary insurance" field is either left blank, or, is populated with a code that indicates that the patient has secondary insurance. *Id.* at ¶ 89. This information is transmitted to the TPP or its pharmacy benefit manager, and in return, the patient's insurance coverage—including the patient's co-payment obligation—is transmitted back to the pharmacist. Instead of collecting the designated co-pay, however, the pharmacist then processes the savings card in a second transaction by entering the relevant information (that is printed on the savings cards or provided by Defendants' co-pay subsidy administrators in separate instructions) into a "secondary insurance" field. See *id.* at ¶ 59. The co-pay subsidy is then deducted from the patient's original co-pay obligation, and the pharmacist collects what remains from the patient.

Plaintiff alleges that Defendants' savings cards should be processed as coupon discounts, as opposed to secondary insurance. If processed as a coupon, the overall price of the drug, instead of just the co-pay amount, would be discounted. See *id.* at ¶¶ 21, 29. In support, Plaintiff points to the fine print of the terms and conditions that patients must accept for the AndroGel savings card. The terms state that the insured "must deduct the value of th[e] offer from any reimbursement requests submitted to [the insured's] insurance plan[.]" *Id.* at ¶ 78.

Defendants ensure that the co-pay subsidies are improperly processed as secondary insurance (and thus concealed from the TPP) in a couple different ways. First, Defendants' co-pay administrators have designed the savings cards to look like insurance cards and to be treated by pharmacy computers as such. See *id.* at ¶¶ 99-103. Second, Defendants and their co-pay administrators instruct pharmacies to process the subsidies as secondary insurance and pay them a significant administrative fee to do so. See *id.* at ¶¶ 103, 130. At least one of Defendants' co-pay subsidy administrators specifically tells pharmacies *not* to process the co-pay subsidies as coupon payments. See *id.* at ¶ 60.

## II. Legal Standards

Defendants have moved to dismiss Plaintiff's amended complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). The purpose of a motion to dismiss is not to decide the merits of the case. A Rule 12(b)(6) motion tests the sufficiency of the complaint, *Gibson v. City of Chi.,* 910 F.2d 1510, 1520 (7th Cir. 1990), while a Rule 12(b)(1) motion tests whether the Court has subject matter jurisdiction, *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 554 (7th Cir. 1999). In reviewing a motion to dismiss under either rule, the Court takes as true all factual allegations in the complaint and draws all reasonable inferences in plaintiff's favor. *Killingsworth,* 507 F.3d at 618; *Long,* 182 F.3d at 554.

To survive a Rule 12(b)(6) motion to dismiss, the claim first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief" (Fed. R. Civ. P. 8(a)(2)), such that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Second, the factual allegations in the claim must be sufficient to raise the possibility of relief above the "speculative level," assuming that all of the allegations in the complaint are true. *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). However, "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what the * * * claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Twombly*, 550 U.S. at 555) (ellipsis in original). The Court reads the complaint and assesses its plausibility as a whole. See *Atkins v. City of Chi.*, 631 F.3d 823, 832

(7th Cir. 2011).

Surviving a Rule 12(b)(1) motion to dismiss is more difficult, as the burden of proof is on the party asserting jurisdiction. *United Phosphorus, Ltd. v. Angus Chem. Co.,* 322 F.3d 942, 946 (7th Cir. 2003). At issue here is the Article III requirement of standing. To proceed, Plaintiff must establish (1) an "injury in fact," (2) a "causal connection between the injury and the conduct complained of," and (3) the likelihood that the injury will be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotations omitted).

**III.    Analysis**

Defendants argue that Plaintiff's RICO claims (counts one through four) and tortious interference with contract claims (counts five and six) are inadequately pleaded under Rules 12(b)(6) and 12(b)(1). The Court addresses only the RICO claims at this time.

Counts one and two of the amended complaint allege that Defendants violated 18 U.S.C. § 1962(c) by engaging in a pattern of racketeering activity, namely mail and wire fraud.[2] Counts three and four allege violations of § 1962(d), conspiracy to violate § 1962(c) of RICO. Section 1962(c) makes it unlawful to conduct or participate in an enterprise's affairs through a pattern of racketeering activity. Racketeering activity is defined to include various predicate acts, including acts that are indictable under the federal mail and wire fraud statutes. See 18 U.S.C. § 1961(1)(B). To proceed under § 1962(c), four elements must be established: (1) the defendant conducted or participated in conducting the activities (2) of an enterprise (3) through a pattern

---

[2] Because Plaintiff's RICO claims are based on the predicate acts of mail and wire fraud, the allegations of fraud must satisfy heightened pleading requirements. Fed. R. Civ. P. 9(b); see also *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 507 (7th Cir. 2007). All averments of fraud and the circumstances constituting fraud must be stated with particularity, see Fed. R. Civ. P. 9(b), or, in other words, must include "'the who, what, when, where, and how,'" *Borsellino*, 477 F.3d at 507 (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)).

7

(4) of racketeering. See *Sedima S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985) (footnote omitted).

Additionally, the plaintiff must allege that she has standing by establishing that injury to her business or property was caused by the RICO violation. *Id.* The plaintiff must show that a RICO predicate offense was the "but for" and proximate cause of her injury. *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 9 (2010). In the context of RICO claims premised on fraud, as is the case here, there must be a sufficiently "direct relationship" between the alleged fraud and the plaintiff's harm. See *id.* at 12. First-party reliance, or the plaintiff's reliance on fraudulent statements, is not required, however. *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 657-58 (2008). The inquiry is instead focused on whether the relationship between the defendant's fraud and the plaintiff's injury is a direct and natural consequence of the scheme to defraud, or, alternatively, whether there are independent factors that account for the injury. See *id.* at 658.

Plaintiff's theory is that Defendants, their co-pay subsidy administrators, and Plaintiff's network pharmacies formed two RICO enterprises to maximize the sales of Humira and AndroGel through Defendants' co-pay subsidy programs. Plaintiff styles the supposed enterprises as the AndroGel co-pay subsidy enterprise and the Humira co-pay subsidy enterprise. Am Compl. ¶¶ 164, 167. Plaintiff contends that the fraudulent *processing* of Defendants' savings cards—as secondary insurance as opposed to coupon discounts—constitutes a scheme to defraud that includes predicate acts of mail and wire fraud. Specifically, pharmacies, in point-of-sale transactions with Plaintiff's insureds, commit fraud by either (1) misrepresenting to Plaintiff that an insured had secondary insurance, when actually, the insured does not and has merely presented Defendants' coupon or savings card, or (2) failing to disclose to Plaintiff that a co-pay subsidy was used. Plaintiff further alleges that Defendants engaged in a scheme to defraud by

8

interfering with Plaintiff's cost-sharing provisions that are enforced through pharmacy network agreements and pharmacy manuals.

Plaintiff ties these predicate acts directly to its economic injuries. Plaintiff alleges that it is "injured in its business or property * * * because material information is concealed from [Plaintiff] and its [pharmacy benefit manager] that would cause [Plaintiff] to refuse payment for AndroGel and Humira at the point of sale." Am. Compl. ¶ 172. In addition, "if Defendants instructed pharmacies to process the payments as the ordinary discounts they are [instead of instructing that they be processed as secondary insurance], the pharmacist would deduct the amount of the discount from the price of the drugs before [ ] send[ing] any reimbursement request to [Plaintiff's pharmacy benefit manager]. [Plaintiff] would, accordingly, pay less for each prescription in which one of Defendants' co-pay cards is used." *Id.* at ¶ 174.

Defendants take issue with several aspects of Plaintiff's RICO theory, including the sufficiency of the foregoing fraud allegations. Defendants argue that Plaintiff has merely alleged omissions (the failure to disclose the use of a coupon), and that such omissions are not actionable because pharmacies have no duty to disclose the use of a co-pay subsidy. But the Seventh Circuit has stated that fraud "can be effectuated not only by deceitful statements but also by statements of half-truths or concealment of material facts." *U.S. v. Keplinger*, 776 F.2d 678, 698 (7th Cir. 1985). Moreover, Plaintiff has not merely alleged a failure to disclose the use of a co-pay subsidy. According to Plaintiff, pharmacies also, at the direction of Defendants and their co-pay subsidy administrators, misrepresent to TPPs that the insured has secondary insurance, when actually, a coupon is being fraudulently processed as secondary insurance. These misrepresentations and omissions about Defendants' savings cards are directly communicated to Plaintiff when the pharmacist transmits the insured's primary insurance information to Plaintiff

9

when prescriptions are filled. In addition, the omissions and misrepresentations are alleged to be part of a larger scheme to systematically conceal the use of savings cards to thwart Plaintiff's efforts to implement cost-sharing provisions through pharmacy network agreements. Cf. *Reynolds v. East Dyer Dev. Co.*, 882 F.2d 1249, 1252 (7th Cir. 1989) (affirming summary judgment to defendants on RICO claim based on a "mere failure to disclose" as plaintiffs failed to show that defendants "made any affirmative misrepresentations * * * or any other misstatements or statements of half-truths that could be said were calculated to deceive" nor were the omissions associated with an "elaborate attempt at concealment") (internal quotations omitted).

Ultimately, however, Plaintiff's RICO claims must be dismissed because Plaintiff fails to allege a viable RICO enterprise. Section 1962(c) requires Plaintiff to allege an enterprise that is separate and distinct from Defendants. See *United Food and Commercial Workers Unions and Employers Midwest Health Benefits Funds v. Walgreen Co.*, 719 F.3d 849, 853 (7th Cir. 2013). Although the enterprise requirement is interpreted broadly, an association-in-fact enterprise nonetheless must have certain structural features, including a purpose, relationships among those associated with it, adequate longevity, and an ascertainable structure. See *id.* at 854 (citing *Boyle v. United States*, 556 U.S. 938 (2009)). It is not enough to allege that members of the enterprise "had a commercial relationship"; they must instead have "joined together to create a distinct entity" for a specific purpose. See *id.* at 855.

A plaintiff must also allege that the enterprise members were conducting the affairs of the enterprise, as opposed to their own affairs. *Walgreen Co.*, 719 F.3d at 854. In other words, the actions, communications, and conduct at issue must be "undertaken on behalf of the *enterprise*" as opposed to on behalf of the alleged enterprise members "in their individual capacities, to

10

advance their individual self-interests." *Id.* The existence of a commercial relationship and cooperation between two companies that allows for the perpetration of fraud does not automatically indicate an enterprise; rather, the complaint must allege facts that show the enterprise members formed the association-in-fact for purposes of carrying out the enterprise's goals. See *id.* at 855. Under the foregoing standards, Plaintiff's amended complaint does not allege a plausible enterprise.

First, the allegations fall short of meeting the structural requirements of an association-in-fact enterprise. Plaintiff essentially alleges so-called "hub-and-spoke" enterprises. Defendants' co-pay subsidy administrators are at the middle (as the hub), and they instruct pharmacies (the spokes) to process Defendants' savings cards as secondary insurance (and they also pay pharmacies a fee to do so). But there are no indicia of any association among the pharmacies beyond the fact that they all allegedly process Defendants' co-pay subsidies as secondary insurance. For example, there are no allegations that pharmacies that comprise the RICO enterprise are in communication with one another or are even aware that other pharmacies are part of the enterprise. Nor are there allegations that pharmacies share among one another the common goal of increasing the sales of Humira and AndroGel by processing Defendants' co-pay subsidies as secondary insurance. This structure is insufficient to allege a viable association-in-fact RICO enterprise. See *In re Pharm. Indus. Average Wholesale Price Litig.*, 263 F. Supp. 2d 172, 183 (D. Mass. 2003) (collecting cases to illustrate that most courts have rejected hub-and-spoke RICO enterprises); see also *Blue Cross and Blue Shield of Alabama v. Caremark, Inc.*, 98-CV-1285, 1999 WL 966434, *8 (N.D. Ill. Sept. 30, 1999) (finding no enterprise because "Plaintiffs fail to allege how [a] large and geographically diverse group of almost 3,000 independent physicians and entities acted in concert with one another with the common purpose

11

of defrauding Plaintiffs.").

Plaintiff contends that Defendants' co-pay subsidy administrators supply a "rim" linking the pharmacies to one another, because these administrators "interject[ ] themselves into the pharmacies' day-to-day affairs to encourage pharmacies to promote Abbott's co-pay subsidy programs." Pls.' Opp'n at 33. This does not correct the deficiency, as Plaintiff cannot point to any allegations that indicate communication or association among the various *pharmacies*.

Plaintiff also relies on *In re Managed Care Litigation*, 185 F. Supp. 2d 1310 (S.D. Fla. 2002) to support its purported enterprise. There, the court found an extensive and national enterprise consisting of a "network" of various entities and persons in the healthcare field, including insurance companies, health plans, physicians, hospitals, pharmacies, and medical laboratories. Plaintiff tries to paint the relationship between pharmacies, Defendants, and the co-pay subsidy administrators as a similar "network," sufficient to satisfy an association-in-fact enterprise. This argument is unpersuasive.

For one, the Florida district court's holding was based on the Eleventh Circuit's relaxed structural standard for RICO enterprises. See *In re Managed Care Litig.*, 185 F. Supp. 2d at 1323 (explaining there is "no strict 'structure' requirement" in the Eleventh Circuit and that a RICO enterprise need not possess even an ascertainable structure) (citing *United States v. Goldin Indus.*, 219 F.3d 1271, 1274-75) (11th Cir. 2000)). In contrast, the Seventh Circuit does require an ascertainable structure, including sufficient relationships among the enterprise participants. See, *e.g.*, *Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640, 644 (7th Cir. 1995) (explaining that a RICO enterprise must be "an ongoing 'structure' of persons associated through time, joined in purpose, and organized in a manner amenable to hierarchal or consensual decision-making.") (quoting *Jennings v. Emry*, 910 F.2d 1434, 1440 (7th Cir. 1990)). Second, unlike *In re Managed*

*Care Litigation*, Plaintiff does not allege facts demonstrating that the pharmacies were part of a larger network along with Defendants and their co-pay subsidy administrators. While Plaintiff alleges that OPUS Health and PDMI boast on their websites that they have "networks" of pharmacies generally, Am. Compl. ¶¶ 94, 134, there are no allegations that the pharmacies at issue here are linked in a way that suggests the type of structure that RICO requires.

Beyond these structural shortcomings, the allegations do not suggest that pharmacies acted to further the purported goal of the enterprises—namely, "maximizing sales" of Humira and AndroGel via fraudulent processing of co-pay subsidies. While the amended complaint includes some allegations of cooperation between pharmacies and the co-pay subsidy administrators, it falls short of indicating that pharmacies processed savings cards in a fraudulent manner in order to further the distinct goals of an enterprise, separate and apart from the pharmacies' business. In some respects, the amended complaint suggests that pharmacists that processed savings cards as secondary insurance did so *unknowingly* because the cards were designed to look like insurance cards. For example, OPUS Health LLC's patent application for its savings card states that the cards "have on them the same indicia as a standard health insurance card," and that "as far as the pharmacy computer is aware, the information on the card is treated as yet another insurance card." Am. Compl. ¶ 100 (quoting U.S. Patent Application No. 11/252,042 (published Apr. 20, 2006)). This allegation undercuts Plaintiff's claim that pharmacies were privy to a fraudulent scheme to maximize Defendants' drug sales. That aside, however, the amended complaint still does not lead to the plausible conclusion that pharmacies acted to maximize the sales of Humira and AndroGel. *Walgreen Co.* is particularly instructive.

In that case, an employee benefit plan brought a RICO action against Walgreens and Par Pharmaceutical Companies alleging that the two formed an enterprise to defraud the plan by

13

filling prescriptions of Par's drugs with a dosage form that was more expensive than the form prescribed to the customer. See 719 F.3d at 850. The *Walgreen Co.* plaintiffs alleged cooperation between Par and Walgreens, including various communications between the two companies in which "Par proposed the drug-switching program and Walgreens agreed to implement it." *Id.* at 854. Par made powerpoint presentations to Walgreens; Walgreens reconfigured its computer system so that the more expensive dosage form was filled, regardless of what was actually prescribed; one of Walgreens's directors conveyed false information to pharmacists about Par's dosage forms; and the two companies negotiated price reductions to offset Walgreens's revenue losses after Walgreens stopped switching dosage forms following scrutiny from the Justice Department. See *id.* at 852. Despite those fairly extensive allegations of association, the Seventh Circuit found that the facts did not support an enterprise:

> [N]othing in the complaint reveals how one might infer that [Par and Walgreens's] communications or actions were undertaken on behalf of the *enterprise* as opposed to on behalf of Walgreens and Par in their individual capacities, to advance their individual self-interests. The complaint does not allege, for instance, that officials from either company involved themselves in the affairs of the other. Par personnel were not responsible for reprogramming Walgreens's computer system, and Walgreens personnel were not involved in Par's manufacturing process. Nor does the complaint anywhere suggest that profits from the illegal drug-switching scheme were siphoned off to the [ ] enterprise or to individual enterprise members. . . . To be sure, Walgreens and Par were not strangers. Representatives from the companies regularly communicated with one another, and Walgreens purchased its generic [drugs] from Par. This type of interaction, however, shows only that the defendants had a commercial relationship, not that they had joined together to create a distinct entity for purposes of improperly filling [drug] prescriptions.

*Id.* at 854-55. Moreover, the fact that the defendants' actions were almost certainly illegal did not demonstrate that they were undertaken on behalf of an enterprise. *Id.* at 855 ("A corporation, after all, is perfectly capable of breaking the law on its own behalf.").

Here, the ties between the pharmacies, on the one hand, and Defendants and their co-pay

14

subsidy administrators, on the other, are likewise deficient. As in *Walgreen Co.*, nothing in the amended complaint creates a plausible inference that various pharmacies are fraudulently processing savings cards as secondary insurance on behalf of an enterprise. There are no allegations that pharmacies have involved themselves in Defendants' marketing strategy or in Opus Health, TrialCard, or PDMIs' business of administering Defendants' co-pay subsidies. Rather, the members of the alleged enterprise appear to be engaging in actions that are consistent with each group "going about its own business." See *id.* at 854-55.

The closest the complaint comes are allegations that (1) OPUS Health offers a feature whereby pharmacists receive real-time messages that co-pay offers may be available to a patient who is filling a prescription, Am. Compl. ¶ 104 (citing OPUS Health's website), and (2) that TrialCard offers a feature in its TrialCard RxSaver product whereby pharmacists are encouraged to deliver "consultation messaging" when a prescription is filled, *id.* at ¶ 129 (citing TrialCard's patent). Such allegations only establish unilateral attempts to encourage pharmacists to promote the drugs of TrialCard and Opus Health's clients, generally. Nothing suggests, however, that the pharmacies that allegedly form the enterprise in *this* case receive these communications. And even if the pharmacies did receive such communications, there are no allegations that any pharmacist actually encouraged patients to purchase Humira or AndroGel in order to further the goals of the purported enterprise.

Accordingly, Plaintiff has failed to allege a violation of § 1962(c). Plaintiff's failure to make out a substantive RICO claim also necessitates the dismissal of its § 1962(d) claims, conspiracy to violate RICO. See *Meier v. Musburger*, 588 F. Supp. 2d 883, 911-12 (N.D. Ill. 2008) ("[F]ailure to make out a substantive RICO claim requires dismissal of a conspiracy claim based on the same nucleus of operative fact.").

15

## IV. Conclusion

For the foregoing reasons, the Court grants Defendants' motion to dismiss [124] on counts one through four and dismisses Plaintiff's RICO claims. With Plaintiff's RICO claims no longer pending, it appears from the face of the amended complaint that the Court may lack subject matter jurisdiction over Plaintiff's remaining state law claims, as Plaintiff has alleged only supplemental jurisdiction under 28 U.S.C. § 1367(a). See Am. Compl. ¶ 22 (alleging federal question jurisdiction as to the RICO claims and supplemental jurisdiction as to the state law claims). Accordingly, the Court will not issue a ruling at this time on the motion as it relates to the motion to dismiss counts five and six. The case is set for status hearing on 10/7/2014 at 9:30 a.m.

Dated: September 25, 2014                                   _____
                                                            Robert M. Dow, Jr.
                                                            United States District Judge